Honorable Marc Barreca

# UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

IN RE:

**MICHAEL R. MASTRO,**

       Debtor.

**BANKRUPTCY NO. 09-16841 (CH. 7)**

---

**JAMES F. RIGBY, JR.**, Trustee, solely in his capacity as Chapter 7 trustee of the bankruptcy estate of Michael R. Mastro,

       Plaintiff,

       v.

**MICHAEL R. MASTRO** and **LINDA A. MASTRO**, and their marital community; **MICHAEL K. MASTRO** and **JANE DOE MASTRO**, and their marital community; **LCY, LLC**, a Delaware limited liability corporation; **LCY, LLC-SERIES HOME; LCY, LLC-SERIES JEWELRY; LCY, LLC-SERIES AUTOMOBILES; THE LCY TRUST; COMPASS TRUST CORPORATION**, a purported Belizean entity; **COMPASS S.A.; MASTRO REVOCABLE LIVING TRUST; MASTRO IRREVOCABLE TRUST; CONCEPT DORSSERS**, a purported Monaco company; **HENDRIK J. DORSSERS**; and **AVATAR INCOME FUND I LLC**, a Delaware limited liability company,

       Defendants.

**ADVERSARY NO. 09-01439-MLB**

**MEMORANDUM OPINION FOLLOWING TRIAL[1]**

---

[1] This disposition is not appropriate for publication. This Memorandum Opinion shall constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

MEMORANDUM OPINION FOLLOWING TRIAL - 1

# **PROCEDURAL HISTORY**

On July 10, 2009, several banks commenced an involuntary Chapter 7 bankruptcy against the debtor, Michael R. Mastro ("**Mastro**"). On August 21, 2009, the Bankruptcy Court (the "**Court**") entered an Order for Relief and Judgment Granting Petition for Involuntary Chapter 7 Petition, and James F. Rigby, Jr. was appointed as Chapter 7 Trustee (the "**Trustee**") for the Mastro estate. The present adversary proceeding was commenced by the Trustee on September 29, 2009. This matter was tried to the Court without a jury on designated days between April 19, 2011 and July 1, 2011.[2]

At the beginning of trial, the Guardian Ad Litem for defendant Mastro moved for entry of a stipulated default judgment against Mastro in the amount demanded by the Trustee. Mastro and his attorney joined in the motion. The Court postponed ruling on the motion while the parties discussed entry of a stipulated judgment against Mastro. On April 25, 2011, the Court entered a Stipulated Judgment Against Michael R. Mastro and His Marital Community (the "**Stipulated Judgment**").

---

[2] Plaintiff Trustee appeared through his attorneys Spencer Hall, Gayle E. Bush, Christine M. Tobin-Presser and Janet D. McEachern. Defendant Linda A. Mastro appeared through her attorney Michael E. Gossler. Defendants Michael K. Mastro and Robin Mastro appeared through their attorney Donald A. Bailey. Defendants Concept Dorssers and Hendrik J. Dorssers appeared through their attorney John J. Tollefsen. Defendant Avatar Income Fund I LLC did not participate in the trial because the claims against Avatar were settled prior to trial. Defendants The LCY Trust, Compass Trust Corporation and Compass S.A. failed to appear for trial.

MEMORANDUM OPINION FOLLOWING TRIAL - 2

# FACTS[3]

## Parties

Plaintiff Trustee brought this action solely in his capacity as Trustee for the Mastro estate.

Mastro and several of his family members are defendants in this proceeding. Defendant Linda A. Mastro ("**Linda**") is Mastro's wife. Defendant Michael K. Mastro ("**Michael K**") is Mastro's son, and defendant Robin Mastro ("**Robin**") is Michael K's wife. Defendant Mastro Revocable Living Trust is a trust formed pursuant to the Mastro Revocable Living Trust Agreement dated October 2, 2002 between Mastro and Linda as grantors, and Mastro as trustee. Defendant Mastro Irrevocable Trust is a trust formed pursuant to the Mastro Irrevocable Trust Agreement dated August 21, 2008 between Mastro and Linda as grantors, and Mastro and Michael K as co-trustees.

Defendant LCY, LLC is a Delaware limited liability company and defendants LCY, LLC – Series Home, LCY, LLC – Series Jewelry, and LCY, LLC – Series Automobiles are Delaware series limited liability companies (collectively the "**LCY LLC Entities**"). Defendant LCY Trust is a trust formed pursuant to The LCY Trust declaration dated October 10, 2008, and is the sole member of the LCY LLC Entities.

Defendants Compass Trust Corporation and Compass, S.A. (the "**Compass Entities**") purport to be entities located in Belize. Compass Trust Corporation was the trustee of The LCY Trust. Compass S.A. was the protector of The LCY Trust.

---

[3] The Court makes its findings in this Memorandum Opinion based both on the stipulated facts set forth in the Pretrial Order (**"Pretrial Order"**) and the evidence presented at trial. Facts discussed in other sections of this memorandum opinion, including, but not limited to, the Analysis section, shall also constitute findings of fact by the Court.

Defendant Hendrik J. Dorssers is a married person who resides primarily in Monaco. Hendrik J. Dorssers is the sole owner of a Monaco proprietorship named Concept Dorssers.

Defendant Avatar Income Fund I LLC ("**Avatar**") is a Delaware limited liability company with its principal place of business in Seattle, Washington.

### Refusals to Testify Based on Assertions of Fifth Amendment Rights

Mastro refused to testify and produce documents regarding his financial condition during the time period from December 1, 2007 to the present, and refused to testify and produce documents regarding the transactions at issue in this adversary proceeding. Mastro based his refusal to testify and produce documents on his Fifth Amendment right against self-incrimination.

Similarly, Thomas R. Hazelrigg, III ("**Hazelrigg III**"), a close friend and associate of Mastro, refused to testify and produce documents regarding the transactions at issue in this adversary proceeding based on his Fifth Amendment right against self-incrimination.

### Mastro's Business Background

Mastro has been in the business of developing real estate since 1967. According to his 2008 Financial Report, Mastro developed and constructed in excess of $2 billion of real estate projects during the previous four decades, consisting primarily of multi-family housing, commercial buildings, and single family residential lot plat projects.

Mastro also was heavily involved in "hard money" lending. Hard money loans are loans too risky to meet the criteria of a bank or other conventional lender, typically involving loan fees and interest rates substantially higher than those charged by conventional lenders. Mastro primarily made hard money loans to cash-strapped real estate developers. The secondary

MEMORANDUM OPINION FOLLOWING TRIAL - 4

financing Mastro provided was typically collateralized with second or third deeds of trust on the developer's real estate project.

Mastro's development operations and hard money lending generated negative cash flows. He depended on borrowed money and property sales to keep his operations afloat. He had two principal sources of financing. One source was short-term loans from banks, and the other was loans from investors known as "**Friends and Family**." The Friends and Family loans were payable on demand. Financing illiquid real estate projects and property with short term loans created very high levels of risk for Mastro in the event of a downturn in the real estate market, since the likelihood of these loans being called, or not being extended or renewed, increased significantly.

### Mastro's Financial Problems and Insolvency

By early 2008, the real estate market began to decline both nationally and in the Pacific Northwest. The decline in the real estate market severely impacted Mastro's business. By August 2008, the real estate market for single family homes and condominiums in the Pacific Northwest had been in a significant and prolonged state of decline. Moreover, Mastro's hard money borrowers – mostly real estate developers - were unable to pay, and Mastro's second and third collateral positions declined significantly in value. Mastro was unable to comply with all the demands that lenders were making for payment or additional collateral on his maturing bank debt.

As set forth above, Mastro's business operations generated negative cash flow, requiring Mastro to borrow money from lenders and Friends and Family or to sell off assets with sufficient equity after paying off secured lenders to provide cash to his business. During the second half of 2008, Mastro was experiencing a negative cash flow on his operations in the amount of

MEMORANDUM OPINION FOLLOWING TRIAL - 5

approximately $2.5 million per month, excluding repayments required on demand notes held by Friends and Family and excluding development costs relating to on-going projects that could not be funded through construction loans. Sales of completed projects had generally ceased, leaving insufficient funds to cover the operational losses.

Many of Mastro's hard money loans had become worthless by August 2008, or were severely impacted. For instance, in August 2008 Mastro had in excess of $25 million in cash losses on five loans related to Hazelrigg III. Not a single payment was made on these five loans in 2008. In August 2008, Mastro's projected receipts on hard money loans totaled less than $50,000 per month compared to Mastro's obligation to pay more than $900,000 in interest per month to lenders from whom Mastro borrowed funds to enable him to make the hard money loans.

Throughout 2008, Mastro owed approximately $100 million to Friends and Family investors. All the Friends and Family obligations were payable on demand. During the period June through September, 2008, Mastro's repayments on the Friends and Family obligations (net of any funds received) averaged approximately $680,000 a month. On or about September 30, 2008, Mastro attempted to alleviate the concerns of Friends and Family investors by sending them a letter that stated, *inter alia*, "Our organization is strong and healthy, in no small part because of the relationship we value so greatly with lenders including you, our friends and family. I hope this report has eased any concerns you may have." This letter was followed by a letter dated October 10, 2008, in which Mastro wrote that he found it necessary to "rescind our long-standing policy of re-paying any Friends and Family loan, in any amount, immediately upon demand."

Mastro's financial records were kept on a cash basis. However, his financial statements were not prepared in accordance with generally accepted accounting principles and were not audited or reviewed by independent accountants. The asset values shown in Mastro's financial statements were not based on the acquisition cost of the properties. Instead, the asset values were based on appraisals or on Mastro's own estimates of value. Many of the appraisals were outdated. Consequently, Mastro's financial statements did not provide a reliable assessment of his financial condition.

Mastro's financial statements showed his net worth at the end of 2008 to be approximately $125.6 million. Mastro's amended bankruptcy schedules, filed nine months later, show Mastro's net worth to be negative $196.4 million. In the amended bankruptcy schedules, Mastro valued his assets at approximately $384.6 million and his liabilities at approximately $581.0 million.

In sum, beginning sometime before August 21, 2008, and continuing through August 21, 2009, the date of the court order granting the Chapter 7 petition, Mastro had an unreasonably small amount of capital for the business in which he was engaged, was unable to pay obligations to his lenders as the obligations became due, and his assets exceeded his liabilities. Mastro became insolvent sometime before August 21, 2008, and remained insolvent at all times through August 21, 2009.

### Linda's Lack of Veracity and Unconditional Deference to Mastro

Generally, this Court found Linda to be a witness lacking veracity as her testimony was often transparently vague, contradictory, and self-serving. For example, at trial she disavowed having signed numerous documents that she had admitted to signing in her deposition. In addition, important portions of Linda's sworn testimony, submitted to the Court via declaration

prior to the trial, proved to be utterly false. She disclaimed knowledge of her own affairs to such an extent that her testimony was not credible.

It is clear to this Court that although Linda claimed she was unaware of her husband's activities regarding their financial and personal affairs, and hid behind her husband's control of their affairs, she very much wanted to reap the benefits of his activities and willingly acquiesced in his management of their affairs. Moreover, she repeatedly testified that she was aware Mastro signed her name on various documents, and that she had, either expressly or implicitly, given him unconditional, absolute permission to do so. Despite her prior work experience as a banker, she testified that she totally deferred to Mastro with regard to financial matters. She indicated that she had always relied on Mastro in such a manner, and his having control of their financial affairs had always worked out well for her in the past. Indeed, Linda substantially benefited from Mastro's management of their affairs. In essence, Mastro controlled every aspect of their financial affairs with Linda's unconditional blessing.

### Mastro's and Linda's Relationship and Marriage

Mastro and Linda met in the mid-1970s and, following a long courtship, married on June 3, 1989. Prior to their wedding, Mastro and Linda entered into a Premarital Agreement (the "**Premarital Agreement**"). The recitals to the Premarital Agreement indicate that Mastro owned "substantial real property, personal property and pecuniary rights, which he will continue to own after marriage as his separate property," and that he intended "to continue devoting all his time and efforts, after marriage, to the management and enhancement of his separate property and the rents, issues and profits thereof." Mastro's and Linda's respective separate estates were itemized and attached to the Premarital Agreement. Linda's separate estate allegedly included

MEMORANDUM OPINION FOLLOWING TRIAL - 8

cash ($204,301), a house ($450,000), a car ($20,000), jewelry ($1,000,000), furs ($200,000) furs,

and furniture ($100,000).  Her net worth was stated to be $1,947,301.

The Premarital Agreement provided, in part:[4]

> The property rights, earnings and acquisitions of each party, from whatever source, shall be the same as if the parties were not married or cohabitating.  All earnings of either party resulting from the personal efforts of a party shall be the separate property of the one devoting his or her personal efforts.  Any enhancement in value, from whatever cause, shall inure to the benefit of the owner of the asset.  If one party devotes labor to the separate property of the other, the value of such labor, or any resulting enhancement in value, shall not give the party devoting the labor any legal or equitable interest in the other's separate property, unless otherwise agreed in writing.
> . . .
> All assets of every kind, which either party may acquire, shall be the separate property of the acquiring party, except as hereafter set forth.  Any gift of separate property, from one party to the other, shall be the separate property of the one to whom the gift is made if said gift is in writing; provided, however, that no writing is required as to a gift of personal property of ornamental or personal use, such as jewelry or clothing.
> . . .
>
> Mike . . . shall be obligated to compensate Linda and the community for his earnings and acquisitions being his separate property.
> . . .
>
> A bank account shall be opened entitled "**Mastro Special Account**," on which checks or withdrawals shall be signed by Mike.
>
> All deposits into the Mastro Special Account shall be community property.
>
> Mike shall deposit into the Mastro Special Account, from his separate funds, $200,000 per year . . . in monthly or other convenient periodic intervals.

---

[4] Bolded emphases added.

The source of the funds deposited shall be from . . . earned income of Mike, or, . . . from Mike's other separate property. . . . Any balance of Mike's earnings, which may be in excess of $200,000 per year, shall remain his separate property.

Any assets acquired with Mastro Special Account funds shall be community property.

The parties shall also open a checking account entitled "**Mike and Linda Mastro Account**," on which checks or withdrawals may be made by either of them. Deposits . . . shall be made by transfer of funds from Mike's separate property. Mike agrees to deposit $5,000 per month into this account, which shall be primarily for Linda to manage. All funds deposited into this account shall be community property. Any assets acquired with these funds shall also be community property.

All community living expenses shall be paid from the [Mastro Special Account and Mike and Linda Mastro Account.]
. . .

This Agreement shall be governed by and construed in accordance with the laws of the State of Washington, no matter where the parties may reside.
. . .

Linda hereby acknowledges that all property acquired by Mike prior to and after June 3rd, 1989, the date of their marriage, is the separate estate of Michael R. Mastro.

In essence, Mastro's and Linda's separate property at the time of their marriage was to remain their separate property, any enhancements from their separate property were also to remain their separate property, and they were to create a very limited amount of community property by establishing the "Mastro Special Account" and "Mike and Linda Mastro Account."

The actions and inactions of Mastro and Linda following their marriage were directly and substantially in contravention of the terms of the Premarital Agreement. For example, Mastro and Linda failed to open the two bank accounts described in the Premarital Agreement. No "Mastro Special Account" was opened to provide for the gradual accumulation of community

MEMORANDUM OPINION FOLLOWING TRIAL - 10

property in the amount of $200,000 per year.  Likewise, no new "Mike & Linda Mastro Account," described as an account into which Mastro was to make a monthly deposit and to be primarily managed by Linda for her personal use, was opened.

Rather, Mastro and Linda held and enjoyed a wide array of property together, including their residences, vehicles, various items of jewelry, and funds in various bank accounts on which they were both signators.

As of July 2008, Mastro and Linda owned three vehicles, all titled in Linda's name – (1) a 2007 Bentley (the "**Bentley**"), (2)  a 2008 Phantom Rolls Royce (the "**Rolls Royce**"), and (3)  a 2006 Range Rover (the "**Range Rover**").  Mastro primarily drove the Bentley and Linda primarily drove the Range Rover.  The Rolls Royce was purchased in June 2008. At the time Mastro proposed marriage to Linda, he gave her a diamond engagement ring (the "**Engagement Ring**"), which was later stolen in the early 1990s.  The ring that Linda referred to at trial as her "engagement ring" was not in fact the original Engagement Ring given to her by Mastro.  Rather, Linda was referring to a wholly different, larger diamond ring – a 14 karat white gold ring with a 15.93 carat round diamond (the "**15.93 Carat Ring**") -- that Mastro and she acquired years after they had been married, and years after her original Engagement Ring was stolen.[5]  In 2005, in early celebration of their wedding anniversary, Mastro and Linda acquired a platinum ring with a 27.80 carat pear shaped diamond ("the **27.80 Carat Ring**"). Both the 15.93 Carat Ring and 27.80 Carat Ring were acquired with community assets.

Linda testified during trial that she does not now know the location of the 15.93 Carat Ring or the 27.80 Carat Ring.  She testified that she gave them to Mastro because she was "sick

---

[5] In fact, the 15.93 Carat Ring was acquired only after an earlier, smaller diamond ring that was itself purchased post-marriage by Linda and Mastro, years after her original Engagement Ring had been stolen.

MEMORANDUM OPINION FOLLOWING TRIAL - 11

of those rings." According to Linda's attorney, Mastro refused to tell Linda where the rings are located. Linda testified that she does not believe they have been sold, but does not know for sure. The Court finds that as of the time of Linda's testimony to the Court Mastro and Linda still held the rings and that Linda knew where the rings were and had joint control of the rings with her husband.

As set forth above, during the course of Mastro's and Linda's relationship, Mastro controlled every aspect of their financial affairs with Linda's unconditional approval. At trial, Linda testified that she believed she had executed a general power of attorney in favor of Mastro, even though she said the signature on the version submitted into evidence was not definitively her own. Whether a legally enforceable power of attorney was executed or not, Linda's testimony was clear that she had authorized Mastro to manage her financial affairs and to sign her name on documents at his pleasure. Linda repeatedly testified that Mastro handled all of their financial affairs, that she was aware Mastro signed her name on various documents, and that this arrangement was wholly acceptable to her. Mastro's management of his and Linda's affairs was broader than mere management of their marital community. Linda's testimony indicated that her ongoing approval of Mastro's discretion in managing their affairs was absolute and unconditional – regardless of what property was affected by his actions.

### Mastro Revocable Living Trust

On or about October 2, 2002, Mastro and Linda as grantors, and Mastro, as trustee, entered into the Mastro Revocable Living Trust Agreement, forming the Mastro Revocable Living Trust (the "**Revocable Trust**"). The named beneficiaries of the Revocable Trust were Mastro and Linda as long as both of them were still living. Over time Mastro and Linda conveyed three houses into the Revocable Trust.

MEMORANDUM OPINION FOLLOWING TRIAL - 12

On or about October 2, 2002, Mastro and Linda, as husband and wife, executed a quitclaim deed conveying the "**Clyde Hill House,**" a house located at 2040 89th Avenue N.E., Clyde Hill, WA that they had acquired on or about December 27, 1993, to Mastro as trustee of the Revocable Trust.

On or about July 19, 2006, Mastro and Linda acquired a house located at 3435 Evergreen Point Way, Medina, WA (the "**Medina Residence**") for $15,000,000. On or about June 9, 2008, they executed a quitclaim deed conveying the Medina Residence to Mastro, as trustee of the Revocable Trust.

On or about July 7, 2008, Mastro as trustee of the Revocable Trust, acquired a residence located at 153 N.W. Highland Drive, Shoreline, WA (the "**Highlands House**"). Thus, as of August 2008, the Revocable Trust owned the Clyde Hill House, Highlands House and Medina Residence. The Clyde Hill House, Highlands House, and Medina Residence, were free and clear of liens, and were among Mastro's and Linda's most valuable unencumbered assets. No consideration was paid for the transfer of the properties into the Revocable Trust.

### Mastro Irrevocable Trust

On or about August 21, 2008, Mastro and Linda, as grantors, and Mastro and Michael K, as co-trustees, entered into the Mastro Irrevocable Trust Agreement, forming the Mastro Irrevocable Trust (the "**Irrevocable Trust**"). The named beneficiaries of the Irrevocable Trust were Mastro and Linda. On or about August 21, 2008 Mastro, as trustee of the Revocable Trust, executed a quitclaim deed conveying the Clyde Hill House, Highlands House, and Medina Residence to Mastro and Michael K, Co-Trustees of the Irrevocable Trust. The properties were valued by Mastro and Linda (in the Irrevocable Trust documents) at $23.7 million and were unencumbered at the time they were transferred into the Irrevocable Trust. Specifically, the

MEMORANDUM OPINION FOLLOWING TRIAL - 13

Medina Residence was valued at $18 million, the Clyde Hill House was valued at $3.5 million, and the Highlands House was valued at $2.2 million. The properties were among Mastro's and Linda's most valuable Assets, and no consideration was paid for the transfer of the properties into the Irrevocable Trust. Linda testified that Mastro signed her name on the Irrevocable Trust Agreement.

At all times, Mastro had de facto control over transactions involving the Irrevocable Trust. The concurrence of both co-trustees of the Irrevocable Trust was technically required for any transfer of property out of the Irrevocable Trust. However all transactions involving the Irrevocable Trust were done pursuant to Mastro's directions. Michael K's participation in the Irrevocable Trust appears to have been motivated by his personal relationship with his father.

Michael K did not have the ability to use the assets of the Irrevocable Trust for his own personal purposes, and did not do so. All documents effecting transfers of property into or out of the Irrevocable Trust name Michael K solely in his capacity as co-trustee. He never had a beneficial interest in any of the assets held in the Irrevocable Trust. Further, he did not derive any personal benefit from transfers of property into and out of the Irrevocable Trust, nor were such transfers intended to benefit him.

**Avatar Loan**

On or about September 17, 2008, Avatar made a loan in the amount of $3,360,000 to the Irrevocable Trust and received a deed of trust on the Clyde Hill House and the Highlands House as security for the loan (the "**Avatar Loan**"). Both Mastro and Michael K as co-trustees of the Irrevocable Trust gave their consent to the Avatar Loan. All proceeds of the Avatar Loan, less loan charges and closing costs, were paid directly to Mastro or Linda. The disbursements of the proceeds of the Avatar Loan included a $200,000 check payable to Linda. None of the proceeds

MEMORANDUM OPINION FOLLOWING TRIAL - 14

of the Avatar Loan were paid to the Mastro Irrevocable Trust. Neither Mastro nor Linda provided any consideration for the proceeds they received from the Avatar Loan.

### Sale of the Highlands House

On or about October 28, 2008, Mastro and Michael K caused the Irrevocable Trust to sell the Highlands House for $1,950,000. All sale proceeds were paid to Mastro or for his benefit. Avatar received $1,100,000 of the sale proceeds as a payment on the Avatar Loan; another secured creditor, Al Monjazeb received $250,000 as a payment on a different loan; Mastro took $417,978.41 in cash; and the balance went to closing costs. Mastro did not provide any consideration for the funds paid to him or for his benefit from the sale of the Highlands House.

### The LCY Trust

On or about October 10, 2008, Mastro formed an offshore asset protection trust named the "**LCY Trust**" of which Mastro and Linda were the grantors and the primary beneficiaries. The LCY Trust was arranged such that Mastro had the unilateral ability to cause all of the trust assets to be distributed to himself or in any other manner that he directed at any time. The trustee of the LCY Trust was Compass Trust Corporation. The protector of the LCY Trust was Compass SA, a Belizean company. Mastro was the one-man advisory committee for Compass S.A., and under the terms of the LCY Trust agreement, the advisory committee controlled Compass S.A. who, in turn, controlled the trustee, Compass Trust Corporation. Thus, Mastro had effective control over the LCY Trust and all its assets.

From the time of formation, the LCY Trust was the owner and sole member of a series of Delaware limited liability companies known as: (1) LCY, LLC, (2) LCY, LLC – Series Home, LCY, (3) LCY, LLC – Series Jewelry, and (4) LCY, LLC – Series Automobiles (again, collectively the "**LCY LLC Entities**"). Mastro and Linda transferred assets into the LCY Trust

MEMORANDUM OPINION FOLLOWING TRIAL - 15

by placing ownership of the assets in the LCY LLC Entities. No consideration was paid for the transfers of assets into the LCY Entities or LCY Trust. The formation documents for LCY, LLC named Mastro alone as manager, while the formation documents for LCY, LLC – Series Home, LCY, LLC – Series Jewelry and the LCY, LLC – Series Automobiles named Mastro and Linda as managers.

After establishing the LCY Trust and LCY LLC Entities, Mastro and Linda undertook a series of transactions to transfer their most valuable assets into the entities. Linda testified that Mastro signed her name on most of the documents related to the LCY Trust, and that she was unaware of her husband's activities related to the LCY Trust and LCY LLC Entities. The Court does not believe Linda's assertion that she did not participate in utilizing the LCY Trust and LCY LLC Entities to protect Mastro's and her assets. The Court finds that although Mastro appeared to have signed Linda's name on various LCY Trust-related documents, Linda also actually signed various LCY Trust-related documents and had knowledge of the LCY Trust from its inception.

Moreover, Linda's knowledge of the LCY Trust and involvement therewith is confirmed by the documentary evidence. For example, on January 20, 2009 Linda received a check written on the LCY Account, in the amount of $125,000. She admitted at trial that as of January 20, 2009, she was aware of the LCY Account. She testified that she sent the $125,000 to Compass Trust Corporation to assist in setting up yet a *new* trust. Moreover, Linda admitted to signing (in four places) a document relating to the LCY Trust, titled "Declaration of Trust," on or about January 6, 2009. The Court, therefore, finds that Linda knew of and participated in the establishment of the LCY Trust.

### 1. LCY LLC – Series Home

By Quit Claim Deed dated October 10, 2008, Mastro and Michael K, as co-trustees of the Irrevocable Trust, conveyed the Medina Residence into LCY, LLC – Series Home. The Medina Residence was not encumbered by any perfected lien at the time it was transferred.

### 2. LCY LLC – Series Automobiles

By Assignment, dated October 10, 2008, and Gift Statement, dated October 10, 2008, Linda conveyed the Rolls Royce, titled in her name (although the vehicle was in fact a community asset), to LCY, LLC – Series Automobiles. Mastro, as manager of LCY, LLC – Series Automobiles, executed a Letter of Acceptance dated October 10, 2008. The Rolls Royce was not encumbered by any perfected lien at the time it was transferred. Although the LCY, LLC – Series Automobiles formation agreement also contemplates transfer of the Bentley and Range Rover, no assignment documents or other evidence of transfer regarding the Bentley or Range Rover was offered into evidence.

### 3. LCY LLC – Series Jewelry

By Assignment, dated October 10, 2008, Mastro and Linda transferred ownership of the following jewelry to LCY, LLC – Series Jewelry: (a) the 27.80 Carat Ring; (b) the 15.93 Carat Ring; (c) one 18 karat yellow gold diamond solitaire ring with one 14.17 carat round diamond; (d) one 18 karat yellow gold ring with one 9.68 carat diamond; (e) one 18 karat yellow gold ring with two rows of seven diamonds, two rows of five diamonds and two rows of three diamonds; (f) two 2.5 carat earrings; and (g) one ring with one 10.25 carat diamond (collectively, the "**LCY LLC Jewelry**"). Linda admitted in a declaration[6] to signing the Separate Series Agreement LCY LLC – Series Jewelry document, and the attendant assignment document.

---

[6] Declaration of Linda A. Mastro, Dkt. No. 144, dated January 5, 2010.

Linda claimed that five of the seven items of LCY LLC Jewelry did not exist at the time of the transfer (specifically, items (c)-(g) above), and that only the 27.80 Carat Ring and 15.93 Carat Ring (together the "**Big Rings**") actually were transferred into LCY, LLC- Series Jewelry. Given this Court's conclusions regarding Linda's lack of veracity, the Court finds her assertion that some of the LCY LLC Jewelry did not exist at the time of transfer not credible, and finds that all of the LCY LLC Jewelry actually was so transferred into LCY LLC – Series Jewelry. The Court further finds that Mastro and Linda are currently in joint control of tLCY LLC Jewelry.

**4. LCY LLC**

On approximately December 2, 2008, Mastro opened a bank account in the name of "LCY LLC" at JP Morgan Chase ("**LCY Account**"), on which Mastro and Linda were the only authorized signers. Mastro transferred net funds into the LCY Account totaling approximately $1 million. The transfers included a $200,000 check payable to Linda received as proceeds from the Avatar Loan. The LCY LLC Account was not disclosed on Mastro's bankruptcy schedules. It was discovered through documents produced by Nordstrom in response to a subpoena. The Court does not believeLinda's assertions that she was unaware of the LCY Account at or near its inception.

**Dorssers and the $12 Million Medina Deed of Trust**

Hendrik J. Dorssers ("**Hendrik Dorssers**") is a resident of Monte Carlo, Monaco and has resided there since 1978. He is the owner of "**Concept Dorssers**," his trade name registered with the Principality of Monaco since 1997. Concept Dorssers is a proprietorship, not a separate legal entity. This Court shall refer to Hendrik Dorssers and Concept Dorssers together as

MEMORANDUM OPINION FOLLOWING TRIAL - 18

"**Dorssers**," unless the distinction between the two is relevant - in which case the Court shall refer to them separately as "Hendrik Dorssers" or "Concept Dorssers."

Through work contacts, Dorssers developed a friendship with Hazelrigg III, a long-time friend of Mastro. Hazelrigg III introduced Dorssers to Mastro. Dorssers had little personal contact with Mastro, but successfully made a few investments with Mastro over the years, including in a fund Mastro termed "Friends and Family" lenders.

On November 5, 2008, Mastro and John Mastandrea ("**Mastandrea**") executed a promissory note in the amount of $1.2 million (the "**November Note**") in favor of Hendrik Dorssers, secured by a second position deed of trust on property known as "**Cascade Lots**." On November 6, 2008, Hendrik Dorssers wired $1,185,136.01 to Michael R. Mastro Properties.

The November Note indicated that payments to Dorssers were to begin on December 5, 2008. Consistent with the November Note, from December 2008 to July or August of 2009, Dorssers received at least seven interest-only payments in the amount of $9,876.13 each.[8] This payment amount ($9,876.13) would reflect 10% per annum interest-only payments on a $1,185,136 balance. The Court finds that these payments related to the November Note.

Dorssers became concerned with the quality and extent of his security interest in the Cascade Lots and requested that Mastro provide him with additional security for the November Note loan. Dorssers and his wife, Dina, communicated back and forth with a Mastro associate regarding same.

In a separate purported transaction, on or about February 16, 2009, Mastro, Linda, and LCY, LLC–Series Home executed a promissory note in favor of Concept Dorssers (the

---

[8] The Court has only seven checks submitted into evidence (December 2008, and January, March, April, May, June, and July 2009); however, Dorssers' assertion of having received nine payments is undisputed. The December payment was for $8,117.37, rather than $9,876.13, apparently reflecting proration.

MEMORANDUM OPINION FOLLOWING TRIAL - 19

"**February Note**"), secured by a deed of trust on Mastro's and Linda's Medina Residence (the "**Medina Deed of Trust**").  The February Note provided that "Maker promises to pay the sum of Twelve Million and No/100 Dollars ($12,000,000.00 U.S.) or so much thereof as may be disbursed to, or for the benefit of the Maker in accordance with the terms of this Note."  The Medina Deed of Trust states that the grantor is LCY, LLC – Series Homes, that the grantee is Concept Dorssers, and that its purpose is to secure all amounts due under a $12 million promissory note "of even date."[9]  Notably, the Medina Deed of Trust, by its own terms, does not secure the earlier November Note, but rather the February Note of "even date."

The February Note and Medina Deed of Trust transaction was purportedly closed by escrow on February 20, 2009 pursuant to the Closing Agreement and Escrow Instructions (the "**Escrow Agreement**").  An addendum (the "**Addendum**") to the Escrow Agreement provided that $1,200,000 of the $12,000,000 loan had been "[a]dvanced to the borrower outside of this escrow" and that the "remaining balance of $10,800,000 will be disbursed by the lender directly to the borrower outside of this escrow."  Dorssers has never claimed that he intended, or would have been able, to advance funds in any amount even close to $10,800,000.  It is undisputed that Dorssers advanced no new funds to LCY LLC – Series Home, Linda, or Mastro, in connection with the February Note transaction.  The Addendum further provided that "[t]he 1% loan origination fee of $120,000.00 has been or will be paid to the lender outside of this escrow."

The Medina Deed of Trust was recorded on February 20, 2009.  However, there was no intent by Linda, Mastro, or LCY LLC – Series Home to encumber the Medina Residence to secure any obligation to Dorssers. Rather, the recording of the Medina Deed of Trust was

---

[9] The reference to LCY, LLC – Series Homes appears to be an inaccurate reference to LCY LLC – Series Home.

MEMORANDUM OPINION FOLLOWING TRIAL - 20

intended by Mastro to hinder, delay or defraud his creditors by giving the appearance that the Medina Residence was encumbered for a $12,000,000 obligation while it really was not.

On an unknown date, it appears that Mastro, Linda, and LCY LLC-Series Home signed an undated one-page agreement called Loan Fee (the "**Loan Fee Agreement**") referencing the February Note. The Loan Fee Agreement provided that Mastro, Linda, and LCY LLC-Series Home would pay Concept Dorssers $120,000 as a loan fee, and that payments to Concept Dorssers in the amount of $3,000.00 per month would commence March 1, 2009. The Loan Fee Agreement does not appear to have been signed by Dorssers. Once monthly, from March to July 2009, Dorssers received five $3,000 checks.

The February Note transaction was never consummated and was a sham. Although Dorssers advanced approximately $1,200,000 in connection with the November Note, Dorssers did not advance new funds as contemplated by the express terms of the February Note. The November 2008 Promissory Note was not canceled and remains unpaid. And, the plain terms of the February Note and Medina Deed of Trust are blatantly inconsistent with the transaction that Dorssers asserts occurred. Thus, nothing is owed on the February Note and Medina Deed of Trust.

Further, Dorssers did not receive delivery of the February Note. Although Dorssers testified that in 2009, while staying at a property owned by or rented to Hazelrigg III, he briefly held a stack of papers containing the original February Note and Medina Deed of Trust, the Court finds his version of events to be self-serving and inaccurate. Although the Court found Dorssers to be a generally truthful witness, his memory often seemed poor and he appeared particularly confused about the timing and sequence of these events.

MEMORANDUM OPINION FOLLOWING TRIAL - 21

After delivery of the February Note became an issue in this case, possession of the February Note was requested by Dorssers' present counsel. The Court ordered Trustee's counsel to hold the original February Note.[10] Among the documents delivered with the February Note was a reconveyance of the Medina Deed of Trust (the "**Medina Reconveyance**") which purported to be signed by Dorssers. However, Dorssers testified that the signature was a forgery, that he would not have signed something that would have risked nullifying his security interest, and that the signature was not done in the pattern of his regular signature. The Court finds that Dorssers, indeed, did not sign the Medina Reconveyance.

On or about September 11, 2009, Dorssers was awakened in the middle of the night at his Monaco home by an incoming fax from Hazelrigg III. The fax was a "**Memorandum of Understanding,**" back-dated to December 11, 2008. Dorssers immediately called Hazelrigg III to inquire about it. Hazelrigg III advised Dorssers that he needed to sign the document. The Memorandum of Understanding purported to set forth a December 11, 2008 agreement for Concept Dorssers to enforce the February Note and Medina Deed of Trust on behalf of other parties also purportedly secured by the Medina Deed of Trust. After Hendrik Dorssers saw Concept Dorssers was listed in the Memorandum of Understanding as being first position on the Medina Deed of Trust, Dorssers signed the document, faxed it back to Hazelrigg III, and went back to sleep. No Memorandum of Understanding bearing Mastro's original signature has been produced or offered into evidence. Dorssers admitted that the first time he ever saw the Memorandum of Understanding was when it was faxed to him in the middle of the night on September 11, 2009.

---

[10] The Court ruled the production of the original note was not to alter the status quo of the parties with regard to whether "delivery" had or had not been effectuated.

Hazelrigg III hired Cairncross & Hempelmann, P.S. ("Cairncross") to represent Concept Dorssers with regard to the February Note and Medina Deed of Trust. In September 2009, on behalf of Concept Dorssers and other investors ostensibly covered under the Medina Deed of Trust, Cairncross caused a Notice of Default to be issued, asserting the entire February Note was in default. Dorssers eventually obtained separate counsel and terminated efforts to foreclose on the entire $12,000,000 February Note.

## Mastro's and Linda's Use of LCY Account Funds

Mastro and Linda distributed to themselves or spent for their benefit $995,106 from the LCY Account, net of amounts that they withdrew and later re-deposited back into the account. They used the LCY Account funds to pay for luxury automobiles, fine dining, designer clothing, trips to ski resorts, travel to Europe and Palm Springs, gold and lawyers. Examples include: (a) a cash payment of $125,000 to Linda on January 20, 2009, (b) the purchase of 100 gold coins[11], (c) payment of $85,500 to Mastro's attorneys (Bucknell and Frush), as well as attorneys representing Linda (Gossler), and Michael K (Malnati),[12] (d) payments of more than $73,000 on the Bentley and the Rolls Royce, and (e) expenditures of more than $42,000 on luxury travel (including stays in London, Paris, Rome, Milan, and Gstaad, Switzerland).

On July 10, 2009, the date of Mastro's bankruptcy filing, the balance in the LCY Account was $379,039.37. However, despite being an asset of the estate, the LCY Account was not listed

---

[11] Notably, these coins were purchased in August or September of 2009, and are not to be confused with the gold coins purchased later in December 2009-January 2010.

[12] On approximately February 17, 2010, Mastro used funds from the LCY Account to purchase cashier's checks payable to his attorneys as follows: Bucknell ($20,000) and Frush ($10,000). On approximately March 8, 2010, Mastro used funds from the LCY Account to purchase cashier's checks payable to his and Linda's attorneys as follows: Bucknell ($15,000), Gossler ($12,000), Frush ($10,000), and Malnati ($8,000). On approximately April 20, 2010, Mastro used funds from the LCY Account to make two payments totaling $10,500 to Michael K's attorney, Malnati.

MEMORANDUM OPINION FOLLOWING TRIAL - 23

in the bankruptcy schedules filed by Mastro.   On March 29, 2010, the Court entered an order stating: "Michael R. Mastro and Linda A. Mastro shall take no action to transfer or encumber any interest in [the LCY Entities] or any asset of the foregoing entities without written permission of the Trustee or leave of the Court" (the "**Agreed Order**").   As of March 29, 2010, the balance in the LCY Account was $60,692.   In contravention of the Agreed Order, after March 29, 2010, Mastro and Linda disbursed substantially all of these remaining LCY Account funds.

### Transaction with Jaguar Land Rover Bellevue

On or about February 2009, Mastro and Linda undertook a series of transactions with Jaguar Land Rover Bellevue (the "**Bellevue Dealership**") to extract the cash equity from their three vehicles.   Mastro's and Linda's Bentley, Rolls Royce, and Range Rover were owned free and clear of encumbrances at the time.   The Bellevue Dealership purchased Mastro's and Linda's vehicles[13] for $300,000, and then immediately sold them back to Mastro and Linda as "used" vehicles.

By check dated February 18, 2009, Bentley Bellevue (an entity affiliated with the Bellevue Dealership), paid Linda $300,000 in "loan proceeds."   The Rolls Royce was the purported collateral for the loan.   The $300,000 was deposited into Mastro's and Linda's joint account at Charles Schwab.

The $300,000 check from Bentley Bellevue was effectively a tender of funds for the purchase of Mastro's and Linda's Rolls Royce.   In addition, pursuant to similar transactions, at

---

[13] Although Mastro and Linda had previously transferred the Rolls Royce to LCY LLC – Series Automobile, the vehicle apparently was titled in Linda's name at the time of the Bellevue Dealership transaction.

MEMORANDUM OPINION FOLLOWING TRIAL - 24

least $65,000 was received for the Land Rover, and at least $50,000 was received for the Bentley.

Following receipt of the funds, Mastro and Linda then executed purported purchase agreements to buy back each of their "used" vehicles from the Bellevue Dealership. The Court does not believe Linda's assertions that she was not involved in the Bellevue Dealership transactions.

Notably, the transactions with the Bellevue Dealership coincide almost exactly in time with the purported encumbrance of Mastro's and Linda's Medina Residence.

### Gold Bars

On approximately March 23, 2009, Mastro purchased 100 gold bars (the "**Gold Bars**") for a payment of $99,300. The Trustee asserts that the funds used to purchase the Gold Bars came from the sale proceeds of the Rolls Royce. The Gold Bars were shipped to Mastro's and Linda's Medina Residence on April 15, 2009. There were less than three months between the date the Gold Bars were shipped and the date of the bankruptcy filing. Yet, the Gold Bars were not listed in the bankruptcy schedules filed by Mastro.

Mastro and Linda have refused to disclose the location of the Gold Bars or to reveal whether they have been disposed of. Linda asserted that she had no knowledge of the Gold Bars. The Court finds it inconceivable that Linda did not know that the Gold Bars existed, were delivered to her house, and were property of the estate. Thus, this Court finds that the Gold Bars existed on the date of petition, that Mastro and Linda have at all times known where the Gold Bars are located, and that the Gold Bars are currently in Mastro's and Linda's possession or control.

## Disposition of the Rolls Royce

On July 28, 2010, in direct violation of the Agreed Order, Mastro and Linda sold the Rolls Royce that Linda had previously transferred to LCY LLC – Series Automobile to a third party buyer for $272,000. The sales proceeds were in the form of checks payable to the order of Linda Mastro. These checks were deposited into Mastro's and Linda's account at U.S. Bank.

## Ownership of the Big Rings

Toward the beginning of 2010, Linda sought a determination that she was the owner of the Big Rings as her separate property. Linda submitted a declaration to Judge Steiner[14] in December 2009 in which she swore under penalty of perjury that the 15.93 Carat Ring was her wedding ring given to her by Mastro 20 years ago and that the 27.80 Carat Ring was a gift given to her 4 years ago. In January Linda submitted another declaration in which she swore that "[a]t the time Mike proposed that we be married, he gave me a 15.93 karat white gold mounted engagement ring." On June 9, 2010, Judge Steiner entered an Order Granting Linda's Motion for Partial Summary Judgment Regarding Rings and Dissolving Preliminary Injunction ("**Partial Summary Judgment Order Regarding Rings**"). In that order, the Court ruled that Linda was the owner of the Big Rings – the 15.93 Carat Ring and 27.80 Carat Ring as her separate property.

As the case progressed, Linda's statements in her declarations ultimately proved to be false. On June 17, 2011, by oral ruling, Judge Barreca vacated the Partial Summary Judgment Order Regarding Rings, and entered the Order Granting Trustee's Motion to Set Aside Partial Summary Judgment Order Regarding Rings on June 22, 2011. Further, on June 20, 2011, the Court entered an Order Granting Trustee's Motion for Order Preserving Assets ("**Order**

---

[14] Mastro's bankruptcy case and the attendant adversary proceedings were transferred from Judge Steiner to Judge Barreca on October 4, 2010. Following the transfer of the case, Judge Steiner ruled on various matters that were pending before him. Unless the distinction between Judge Steiner and Judge Barreca is relevant, they are referred to as "the Court".

MEMORANDUM OPINION FOLLOWING TRIAL - 26

**Preserving Assets"**).  The Order Preserving Assets required Mastro and Linda to deliver the Big Rings to K. Alan Smith Jewelers by June 22, 2011, pending the outcome of this lawsuit.  Mastro and Linda have failed to comply with the Order Preserving Assets.

### **Gold Coins and Payment of Mastro's and Linda's Attorneys by Hazelrigg III**

On approximately December 14, 2009, Hazelrigg III wrote a $160,000 check to Pacific Funding Group, an entity owned by a business associate of Hazelrigg III.  The funds were used to (1) purchase gold coins (the "**Gold Coins**") that were delivered to Mastro's and Linda's Medina Residence and (2) to pay Mastro's and Linda's attorneys.  Specifically, on December 16, 2009, funds from the Pacific Funding Group account were used to purchase $33,000 in cashier's checks payable to Mastro's and Linda's attorneys.  On December 17, 2009, funds from the Pacific Funding Group were used to purchase a cashier's check payable to Miles Franklin in the amount of $125,000.  Mastro then used the cashier's check to pay for Gold Coins that he had ordered from the Miles Franklin Company on approximately January 4, 2010.  The Gold Coins were shipped to Mastro's and Linda's Medina Residence on January 19, 2010.

On approximately January 19, 2010, Centurion Financial Group ("**Centurion**"), a Hazelrigg III entity, transferred $28,645 to Eric deGooyer by undated check posted in deGooyer's personal account.  On the same date, $28,645 was withdrawn from deGooyer's account to purchase several checks payable to Mastro's and Linda's attorneys.  At the time of these transactions, Centurion owed Mastro in excess of $20 million and purported to be unable to pay the amount due.

Despite proving that these transactions occurred, the Trustee presented no evidence that the funds from Hazelrigg III ($160,000) or from Centurion ($28,645) constituted property of the estate or depleted estate assets through any setoff or other effect of the post-petition transactions.

MEMORANDUM OPINION FOLLOWING TRIAL - 27

## Furnishings, Fixtures, and Other Personal Property in the Medina Residence

When the Mastro bankruptcy was filed in July 2009, Mastro and Linda failed to turn over to the Trustee various property in the Medina Residence that Linda asserted belonged to her as separate property. The Trustee retained the firm of James G. Murphy, Inc. to inventory the personal property in the Medina Residence. The Appraisal Report by James G. Murphy, Inc. (the "**Murphy Appraisal**"), dated January 13, 2010, accurately describes the furnishings, fixtures, and other personal property in the Medina Residence on the date of the inventory. Linda made annotations on the Murphy Appraisal to indicate which property was claimed to be separate.

Linda asserted four sources of separate property: (1) property she brought into the marriage, as set forth in her Premarital Agreement (2) property she inherited from her mother and sister (cash, a residence, jewelry, personal property, and household furnishings), as set forth in their respective wills, (3) property gifted to her by Mastro during their marriage, and (4) property gifted to her from others.

Specifically, Linda asserted that the wine collection described in the Murphy Appraisal was gifted to her as hostess gifts over the years. She also asserted that the Chihuly Chandelier described in the Murphy Appraisal was a gift to her from the artist. In rebuttal, the Trustee produced a letter from the Chihuly Studio to Mastro indicating that the Chihuly chandelier was purchased by Mastro and Linda. Linda claimed she had documentation to prove the Chihuly chandelier was a gift to her, but rested her case without offering the alleged documentation.

## Belizean Entities

The Trustee filed the present adversary proceeding on September 29, 2009. The summons and complaint were served on the LCY Trust, Compass Trust Corporation and

MEMORANDUM OPINION FOLLOWING TRIAL - 28

Compass S.A. (the "**Belizean Entities**") through their agents, William Vigal ("**Vigal**") and Mary Simon ("**Simon**"). Vigal and Simon denied that they were agents of the Belizean Entities and challenged the validity of the service of process, but on December 18, 2009, Judge Steiner ruled that the Belizean Entities were validly served by service on Vigal and Simon. The Belizean Entities sought leave to appeal the ruling but their motion for leave to appeal was denied.

The Belizean Entities filed an answer to the complaint and asserted that the Court had no personal jurisdiction over them. The Court confirms the earlier finding that Vigal and Simon were agents of the Belizean Entities at the time of service and that the Court has personal jurisdiction over the Belizean Entities.

The Belizean Entities refused to participate in discovery in this lawsuit. On March 26, 2010, the Court granted the Trustee's motion to compel discovery from the Belizean Entities (the "**Discovery Order**"). The Belizean Entities refused to comply with the Discovery Order. On May 25, 2010, the Court granted the Trustee's motion for sanctions against the Belizean Entities for refusing to comply with the Discovery Order (the "**Sanctions Order**"). The Belizean Entities were ordered to pay a fine of $1,000 per day from the date of the Sanctions Order to the date they fully complied with the Discovery Order. The Belizean Entities have refused to comply with the Sanctions Order, and a total of $402,000 in sanctions have accrued against the Belizean Entities through conclusion of trial on July 1, 2011.

## Summary Judgment Regarding Self-Settled Trust

On March 25, 2010, the Trustee filed a motion for partial summary judgment asking the Court to rule that the Irrevocable Trust and LCY Trust were self-settled trusts and that the assets of the trusts were property of the bankruptcy estate. On March 26, 2010, the Belizean Entities produced documents purporting to show that Compass Trust Corporation and Compass S.A. had

resigned their positions relating to The LCY Trust, terminated The LCY Trust, and transferred the assets of The LCY Trust to Mastro and Linda. The documents purported to be dated March 19, 2010.

On May 28, 2010, Judge Steiner entered an Order Granting Plaintiff's Motion for Partial Summary Judgment Regarding Self-Settled Trusts ("**Summary Judgment re Self-Settled Trusts**"), ruling that the Irrevocable Trust and LCY Trust are self-settled trusts and, as such, are void as to Mastro's creditors as a matter of law. Similarly, this Court confirms that the Irrevocable Trust and LCY Trust are self-settled trusts and, as such, void as to Mastro's Creditors. Mastro's and Linda's transfers into the Irrevocable Trust were conveyances of assets for their own use and benefit. The same is true for the LCY Trust.

### Sale of the Clyde Hill House

On July 16, 2010, the Court entered an order granting the Trustee's motion to sell the Clyde Hill house "free and clear of all liens" for a sale price of $1,925,000. The net proceeds of the sale were $1,769,470.18. Pursuant to a court-approved settlement agreement with Avatar, the bankruptcy estate recovered $750,000 of the net proceeds and the remainder was paid to Avatar.

### Sale of the Medina Residence

On December 3, 2010, the Court entered an order authorizing the Trustee to transfer the Medina Residence from LCY LLC - Series Home to the bankruptcy estate and to sell the Medina Residence. Pursuant to this order, the Trustee sold the Medina Residence on December 8, 2010. The total net proceeds of the sale were $8,358,989.64. The Trustee placed the net proceeds of the sale of the Medina Residence into an interest-bearing account pending resolution of claims

MEMORANDUM OPINION FOLLOWING TRIAL - 30

asserted by Concept Dorssers and Hendrik Dorssers seeking recovery of a portion of the proceeds.

## ANALYSIS

### Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. §§ 157(a)-(b), § 1334(a)-(b), and 11 U.S.C. §§ 105, 542, 544, 547, 548, 549, 550 and 551.[15]  This is a core proceeding under 28 U.S.C. §157(b)(2)(B), (C), (E), (H), (K) and (O).  The parties have stipulated to trial before the United States Bankruptcy Court without a jury.

### Mastro and Hazelrigg III's Refusal to Testify and Produce Documents

Based on Mastro's and Hazelrigg III's refusal to testify and produce documents based on the Fifth Amendment right against self-incrimination, the Court draws a negative inference with respect to Mastro's financial condition during times material to this case, and with respect to all transactions in which Mastro and Hazelrigg III were participants.  *See e.g., Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *In re Babbidge*, 175 B.R. 708, 721 (Bankr. W.D. Mo. 1994); *In re Bailey*, 145 B.R. 919, 927 (Bankr. N.D. Ill 1992).  However, the Trustee presented sufficient evidence to support the Court's findings independent of the Court's need to draw any negative inferences.  In essence, the negative inferences the Court draws with regard to transactions in which Mastro and Hazelrigg III participated buttress, but do not dictate, any finding or conclusion set forth herein.

---

[15] Absent contrary indication, all "Code" and "Section" references herein are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

MEMORANDUM OPINION FOLLOWING TRIAL - 31

## **Mastro's Insolvency**

Pursuant to the Code, "insolvent" means a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of – (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and (ii) property that may be exempted from property of the estate under Section 522 of this title." 11 U.S.C. § 101(32).

Similarly, RCW 19.40.021 provides that,

> (a)  A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation.
> (b)  A debtor who is generally not paying his or her debts as they become due is presumed to be insolvent.
> . . .
> (d)  Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this chapter.
> (e)  Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.

RCW 19.40.021(a)-(b), (c)-(d).

Prior to August 21, 2008, and continuing through August 21, 2009, the date of the court order granting the Chapter 7 petition, Mastro was insolvent. First, Mastro had an unreasonably small amount of capital for the business in which he was engaged. Given (a) the extremely poor and declining economic conditions, especially regarding real estate property values, (b) the distressed condition of financial markets, and (c) the illiquid nature of Mastro's assets and his available sources of liquidity, Mastro retained an unreasonably small amount of capital at August 21, 2008, and at all times through August 2009, to support his ongoing operations. In essence, his operations were doomed to fail.

MEMORANDUM OPINION FOLLOWING TRIAL - 32

Second, Mastro was unable to pay obligations to his lenders as the obligations became due. Most of Mastro's financing from banks was short term secured and unsecured notes. Declining real estate values and a decrease in real estate sales made it impossible for Mastro to comply with all the demands that his bank lenders were making for payment or additional collateral on his maturing bank debt.

Finally, Mastro's assets exceeded his liabilities. Mastro's financial statements showed his net worth at the end of 2008 to be approximately $125.6 million. However, Mastro's financial statements did not provide a reliable assessment of his financial condition, as they were often based on Mastro's own assessments of value and/or outdated professional appraisals. Moreover, they were unaudited and not prepared in accordance with generally accepted accounting principles. Mastro's amended bankruptcy schedules, filed nine months later, showed Mastro's net worth to be negative $196.4 million. In the amended bankruptcy schedules, Mastro valued his assets at approximately $384.6 million and his liabilities at approximately $581.0 million. Therefore, the Court concludes that given the abysmal state of the real estate market as of August 21, 2008, Mastro's assets had already depreciated in value so as to make him balance sheet insolvent. Mastro became insolvent sometime before August 21, 2008, and remained insolvent at all times through August 21, 2009.

### Mastro's Intent to Hinder, Delay, or Defraud His Creditors

Mastro was insolvent on or before August 21, 2008 – the date of the formation of the Mastro Irrevocable Trust Agreement. The transfers of the Clyde Hill House, Highlands House, and Medina Residence from the long-standing Revocable Trust into the Irrevocable Trust were undertaken by Mastro with intent to hinder, delay or defraud his creditors. The Clyde Hill House, Highlands House, and Medina Residence were among Mastro's and Linda's most valuable

MEMORANDUM OPINION FOLLOWING TRIAL - 33

assets, and they were transferred for no consideration -- at a time when Mastro's businesses were suffering and Mastro was getting pressure from Friends and Family and other creditors. The Irrevocable Trust was designed to give Mastro and Linda use of the Clyde Hill House, Highlands House, and Medina Residence, or proceeds of such properties, while depriving their creditors of the ability to recover from the assets. Although the Irrevocable Trust Agreement had language appearing to give some vague protections to Friends and Family, these apparent protections were more cosmetic than substantive. Moreover, the exhibit purporting to list the "protected" Friends and Family, attached to the executed Irrevocable Trust Agreement, is blank. Further, even if the protections for Friends and Family were enforceable, the Irrevocable Trust Agreement would have placed the assets beyond the reach of most of Mastro's creditors.

Only two months after forming the Irrevocable Trust, as the economy and real estate markets suffered continued decline, Mastro and Linda utilized an increasingly complex series of transactions and entities – the Delaware LCY Entities and Belizean LCY Trust – to supersede the Irrevocable Trust. They also attempted to shield even more assets from creditors. In October 2008, while Mastro was insolvent, Mastro and Linda transferred to the LCY Trust not only the Medina Residence[16], but also the Big Rings and other LCY LLC Series Jewelry, the Rolls Royce, and approximately $1,000,000 to fund a secret bank account – the LCY Account. All of these assets were transferred for no consideration. Despite putting these assets in trust, Mastro and Linda continued to enjoy them and intended to do so for the remainder of their lives. Indeed, after transferring ownership of the assets to the LCY LLC Entities, Mastro and Linda continued to live in the Medina Residence, possess their jewelry, drive the Rolls Royce and spend the LCY Account funds on themselves. The LCY Trust lacked even superficial protections for Friends

_____

[16] The Clyde Hill House and Highlands House were sold in unrelated transactions.

MEMORANDUM OPINION FOLLOWING TRIAL - 34

and Family creditors. Moreover, the LCY Trust was structured in a manner to ensure that Mastro had unilateral control over the assets therein. Although Compass S.A. was the protector of the LCY Trust, Mastro was the one-man Advisory Committee to Compass S.A., holding veto power over Compass S.A.

In February 2009, growing increasingly desperate, Mastro and Linda went to the Bellevue Dealership to extract the equity from their vehicles. Around this same time, the Medina Deed of Trust was recorded against the Medina Residence – despite the lack of any intent by Linda, Mastro, or LCY LLC – Series Home to actually encumber the property. Rather, the recording of the Medina Deed of Trust was an attempt to hinder, delay or defraud Mastro's creditors by giving the appearance that the Medina Residence was encumbered while it really was not. Additionally, beginning in early 2009 and continuing through early 2010, Mastro acquired Gold Bars and Gold Coins – portable and difficult-to-trace assets which could be easily liquidated.

### Defendants' Liability – Trustee's Maximum Recovery

The Trustee is entitled to recover the property and amounts set forth below. The Court notes that Mastro's and Linda's affairs were intentionally structured in a manner so as to make legal liability confusing and uncertain. Thus, where appropriate, this Court bases its conclusions regarding liability on alternate conclusions of law.

In some cases, multiple defendants have liability with respect to the same property. In other cases, there are multiple grounds for a defendant's liability. Notwithstanding multiple defendants being liable or multiple grounds for recovery, the Trustee's maximum recovery is limited to the total value of the property at issue (plus any other awardable amounts such as interest, fees, and costs).

MEMORANDUM OPINION FOLLOWING TRIAL - 35

**<u>Linda Mastro</u>**

Section 541 provides that the commencement of a bankruptcy case creates an estate comprised of

> (1) . . . all legal and equitable interests of the debtor in property as of the commencement of the case.
> (2) All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is --
>     (A) under the sole, equal, or joint management and control of the debtor; or
>     (B) liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.
> (3) Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title.
> . . .
> (6) Proceeds, product, offspring, rents, or profits of or from property of the estate . . .

11 U.S.C. § 541(a). Separate property of a debtor's spouse is not property of the estate. The ultimate characterization of property as either separate or community property is determined according to applicable state law. *See Dumas v. Mantle* (*In re Mantle*), 153 F.3d 1082, 1084 (9th Cir. 1998).

Washington law recognizes the right of spouses to have separate property under RCW 26.16.010. Separate property is defined as property acquired before marriage or acquired after marriage by gift, bequest, devise, descent, or inheritance. *Id.* "[T]he right of the spouses in their separate property is as sacred as is the right in their community property, and when it is once made to appear that property was once of a separate character, it will be presumed that it maintains that character until some direct and positive evidence to the contrary is made to appear." *Guye v. Guye*, 63 Wash. 340, 352 (1911). "Separate property continues to be separate property through all of its changes and transitions so long as it can be clearly traced and

MEMORANDUM OPINION FOLLOWING TRIAL - 36

identified." *In re Estate of Witte*, 21 Wn. 2d 112, 125 (1944). "[W]here separate funds have become so commingled with community funds as to make it impossible to trace the former or tell which are separate and which are community funds, all funds, or property into which they have been invested, belong to the community." *See In re Estate of Binge*, 5 Wn.2d 446, 456-57 (1940).

When property is acquired during a marriage, it is presumed to be community property. *Beam v.* Beam, 18 Wn. App. 444, 452 (Wash. Ct. App. 1977); *Binge*, 5 Wn.2d at 488. The burden of overcoming this strong presumption is on the party asserting the separate nature of the property. *Beam*, 18 Wn. App. 452; *see also e.g. Berol v. Berol*, 37 Wn.2d 380, 381-82 (1950) (finding that husband's "bald statement" that a payment was made from separate funds was insufficient to establish the separate character of the asset); *In re Estate of Allen*, 54 Wn.2d 616, 622 (1959) (finding an "unsupported statement" that stock purchases were separate property insufficient to rebut the presumption that the assets were community property). The presumption in favor of community property "can be overcome only by clear and convincing evidence." *Beam*, 18 Wn. App. at 452.

Premarital agreements are contracts subject to the principles of contract law. *DewBerry v. George*, 115 Wn. App. 351, 364 (Wash. Ct. App. 2003). Under Washington law, a prenuptial agreement may provide for management and classification of future assets and debts. As long as the agreement is freely and intelligently made, it is generally regarded with favor. *Friedlander v. Friedlander,* 80 Wn.2d 293, 301 (1972). However, "[w]hen the evidence and unchallenged findings show the parties did not mutually observe an antenuptial property agreement, the court is not bound to enforce it, but may determine the intentions of the parties, in light of the circumstances before and during marriage, to determine its binding effect." *See In re Marriage*

MEMORANDUM OPINION FOLLOWING TRIAL - 37

*of Fox*, 58 Wn. App. 935, 938 (Wash. Ct. App. 1990) (following *In re Marriage of Sanchez*, 33 Wn. App. 215, 217-18 (1982)). "The burden is upon the spouse seeking to enforce such an agreement to show that it has been strictly observed in good faith." *Fox*, 58 Wn. App. at 938. "The laws of contract respecting rescission of antenuptial agreements, whether in writing or not, are applicable: an agreement. . . to rescind may . . . be in writing or inferred." *Id.* at 939.

In *Fox,* a couple entered into a premarital agreement to protect the wife's separate property - $179,172 received from the estate of her first husband. The premarital agreement provided that "the separate property of each would remain separate after marriage." *Id.* at 936. The trial court found that during the marriage the wife had transferred "all of her separate funds . . . to the joint community checking account, and the funds were then spent by both parties on improvements to the family home . . . and other nonidentifiable items," and that the husband had deposited a $36,000 inheritance into the joint account, "which was spent by both parties on living expenses." *Id.* at 937-38. On appeal, the court noted that "disregard of [a premarital] agreement may establish an intent to abandon it, which may constitute a rescission when factually probable because each party knew the other" had used their separate property assets as community assets. *Id.* at 939. The court also found the passage of 11 years since the parties' execution of the agreement to be persuasive evidence that the parties had intended to abandon their original agreement. *Id.* The court held that the agreement was rescinded and abrogated. *See id.*

1. **Linda has failed to establish her claims of separate property.**

Linda asserted four sources of separate property: (1) property she brought into the marriage, (2) property she inherited from her mother and sister, (3) property gifted to her by Mastro during their marriage, and (4) property gifted from others. Each is addressed in turn.

MEMORANDUM OPINION FOLLOWING TRIAL - 38

### a. Linda has provided no proof of pre-marriage separate property.

The Premarital Agreement between Linda and Mastro provided that she was to own and control her separate property and enhancements thereto, including property she brought into the marriage – allegedly cash ($204,301), a house ($450,000), a car ($20,000), jewelry ($1,000,000), furs ($200,000), and furniture ($100,000) - all totaling approximately $2,000,000. However, the itemization set forth above is the full extent of the itemization provided in the Premarital Agreement. Linda offered nothing in the record to (1) substantiate her annotations on the Murphy Appraisal designating various property as being acquired "before Mike", (2) demonstrate that any of this property still exists, or (3) explain what became of the proceeds from any of this property. For example, the furniture referenced in the Premarital Agreement was not specifically itemized or described, thus it cannot now be identified or traced. In sum, the Court cannot tell what furniture is encompassed by the Premarital Agreement. Likewise, no specific item of jewelry is itemized or described in the Premarital Agreement. The only jewelry referenced in the Premarital Agreement is described generically as "jewelry." Further, the Engagement Ring, alleged to be encompassed by the Premarital Agreement, was stolen. Linda testified that her subsequent diamond rings, including the Big Rings, were acquired years after her Engagement Ring was stolen. And, there is nothing in the record except for Linda's testimony regarding proceeds from the sale of the Hawthorne Hills house. This Court declines to believe Linda's bare assertions of what property was encompassed by the Premarital Agreement. Therefore, this Court holds that Linda has provided no credible proof of pre-marriage separate property. *See Berol,* 37 Wn.2d at 381-82.

MEMORANDUM OPINION FOLLOWING TRIAL - 39

**b. Linda has provided no proof of remaining inherited separate property.**

Linda claims that during her marriage she inherited various furniture, jewelry, and other personal property from her mother and sister, rendering it separate property. The Court believes that Linda previously inherited property from her mother and sister as set forth in their respective wills. However, the Court does not believe Linda's self-serving testimony asserting that any of the inherited property remained in Linda or Mastro's possession at the date of petition. Moreover, the Court compared the wills of both Linda's mother and sister with the list of personal property prepared pursuant to the Murphy Appraisal, on which Linda made annotations to indicate which property was claimed to be separate. The Court was unable trace a devise of any specific piece of furniture or piece of jewelry from either will to the list of property in the Murphy Appraisal. One possible exception was that Linda identified a coral ring as being separate property on the Murphy Appraisal, and indicated that she had inherited it from her sister. However, the only reference to a coral ring is in Linda's *mother's* will, devising the ring directly to Linda (with no involvement of Linda's sister). Given the conflicting evidence, this Court concludes that the coral ring referred to in the Murphy Appraisal was not inherited from Linda's mother or sister, is community property, and is, therefore, property of the bankruptcy estate.

**c. Linda's and Mastro's failure to abide by the terms of their Premarital Agreement rendered it abandoned and rescinded.**

Much proof was presented, and many arguments made, regarding Mastro's and Linda's Premarital Agreement. As discussed below, even if the Premarital Agreement had been honored and was enforceable, Linda failed to meet her burden of showing various assets were her separate property. That said, Linda and Mastro failed to implement the provisions of their

MEMORANDUM OPINION FOLLOWING TRIAL - 40

Premarital Agreement, thereby rendering it abandoned and rescinded. *See generally, Fox*, 58 Wn. App. at 939-40. Linda's testimony demonstrated that Mastro and she abandoned their Premarital Agreement, commingled all of their property, and enjoyed all of their property together.

The Premarital Agreement is a relatively short document, only eight pages exclusive of exhibits. It appears to have been entered into primarily to preserve Mastro's separate property. The recitals to the Premarital Agreement state that Mastro held substantial property "which he will continue to own after marriage as his separate property," and that he intended "to continue devoting all his time and effort . . . to the management and enhancement of his separate property." In exchange, Mastro was "obligated to compensate Linda and the community for his earnings and acquisitions being his separate property . . . and for her joining in, or consenting to, the transactions." Community property was to be created mainly via the Mastro Special Account ($200,000 per year) and Mike and Linda Mastro Account ($5,000 per month). In effect, under the terms of the Premarital Agreement, Mastro and Linda were to share a *very limited* amount of community property as compared to the extent of their combined estates.

The Premarital Agreement also endeavored to preserve Linda's separate property per the terms set forth therein. In essence, each party's pre-marriage property was to remain separate, any future enhancements to separate property were to remain separate, and community property was to be created via the Mastro Special Account and Mike and Linda Mastro Account. The Premarital Agreement further provided for what would happen in the event of the parties' separation, dissolution, or deaths. However, the majority of the Premarital Agreement (five of eight pages) is devoted to discussion of maintaining separate property and creating community property.

MEMORANDUM OPINION FOLLOWING TRIAL - 41

Mastro and Linda contravened the terms of the Premarital Agreement with regard to maintaining separate property and creating community property. For example, Linda and Mastro failed to open the only two bank accounts specifically contemplated by the Premarital Agreement. No "Mike & Linda Mastro Account" was ever opened. Linda testified that her old account at Peoples' Bank (now U.S. Bank) was intended to serve as the Mike & Linda Mastro Account, and that Mastro consistently made deposits into that account, primarily for her to manage. However, although Mastro was added as an authorized signator on that account, the U.S. Bank account is indistinguishable in that respect from Mastro's and Linda's other accounts. Mastro and Linda jointly held *numerous* personal bank accounts post-marriage, including accounts at U.S. Bank, Charles Schwab, HSBC, the LCY LLC account at JP Morgan Chase, and a new account in Palm Desert, California. Likewise, no "Mastro Special Account" was opened to provide for the gradual accumulation of community property in the amount of $200,000 per year. Linda offered no evidence that Mastro consistently deposited $200,000 per year into *any* account, as required by the Premarital Agreement. Rather, Mastro and Linda enjoyed their property together. In sum, both Mastro and Linda failed to maintain the separateness of their separate property following marriage, and failed to create community property as they had agreed.

**d. Aside from the disregarded Premarital Agreement, other evidence is inconsistent with Linda's claims of holding and controlling separate property**.

Even if Mastro's and Linda's Premarital Agreement had been followed and remained enforceable, Linda's claims regarding separate property fail. Linda testified *repeatedly* that she had authorized Mastro to sign her name on any documents he chose to execute on her behalf. As a practical matter, ceding control over all of her legal and financial affairs at a time in her life

MEMORANDUM OPINION FOLLOWING TRIAL - 42

when she was perfectly capable of handling her own affairs is inconsistent with Linda's assertions of holding separate property. Mastro had Linda's unconditional blessing to control every business and financial aspect of their lives, regardless of what property may be affected.

For example, Linda testified during trial that she does not now know the location of the two Big Rings that she claims are her separate property via gift. She testified that she gave them to Mastro because she was "sick of those rings." According to Linda's attorney, Mastro refuses to tell Linda where the rings are located. Linda testified that she does not believe they have been sold, but does not know for sure. This arrangement of leaving Mastro in joint control and possession of the Big Rings is wholly inconsistent with a claim of separate property.

**e. Linda has not established that she received any post-marriage gifts from Mastro that are separate property.**

Linda asserted that various post-marriage gifts from Mastro, including jewelry, ornamental items, and clothing, are her separate property. The most valuable items among this property claimed to be separate are the Big Rings. Linda's trial testimony clarified that both of the Big Rings were acquired post-marriage, despite her earlier sworn statements to the contrary.

Even if the Premarital Agreement were found to be valid and enforceable[17], Linda provided no evidence to support her claims that various property was "gifted" to her by Mastro. Outside of clear and convincing evidence, property acquired during marriage is presumed to be community property. This Court declines to believe Linda's bare assertions that various assets acquired with community funds – including, but not limited to the Big Rings -- were "gifts" from Mastro. *See Berol*, 37 Wn.2d at 381-82.

---

[17] The Premarital Agreement provided that gifts "of personal property of ornamental or personal use, such as jewelry or clothing" did not require a gift statement.

MEMORANDUM OPINION FOLLOWING TRIAL - 43

The Big Rings, in particular, are more like investment assets than property that might be gifted from one spouse to another. They are not mere baubles. In a declaration submitted to the Court, Linda herself asserted that she rarely wore the rings, and when she did, only in settings where their security could be assured. The Big Rings are highly valuable, highly portable, difficult-to-trace assets. The Court, therefore, finds that the Big Rings are not Linda's separate property, but were community property as of the date of petition and are property of the bankruptcy estate.

**f. Linda has not established that the wine collection or Chihuly chandelier are her separate property.**

Linda asserted that the wine collection was her separate property because the wine had been given to her as hostess gifts over the years. The Court does not believe that the wine was gifted to Linda, bottle-by-bottle, as separate property from various guests visiting Mastro's and Linda's home. Outside of clear and convincing evidence, property acquired during marriage is presumed to be community property. If the wine was indeed gifted, the Court concludes that it was gifted to the community of Mastro and Linda.

Similarly, Linda asserted that a Chihuly chandelier valued at approximately $100,000 was a gift to her from the artist. The Court does not believe her. However, even if the chandelier was a gift, the Court finds it incredible that Chihuly would have expressly gifted the chandelier to Linda in her separate capacity. This Court declines to accept Linda's bare assertions that the Chihuly chandelier was a separate property gift. Outside of clear and convincing evidence, property acquired during marriage is presumed to be community property.

In summary, this Court finds that Linda has failed to establish that she holds *any* property in a separate capacity.

MEMORANDUM OPINION FOLLOWING TRIAL - 44

**2.  <u>Linda is liable for turnover of various property pursuant to 11 U.S.C. § 542.</u>**

Section 542 provides that an entity in "possession, custody or control, during the case, of property that the trustee may use sell, or lease . . . or that the debtor may exempt . . . shall deliver to the trustee, and account for, such property or the value of such property."  11 U.S.C. § 542. "Although courts disagree, most of the appellate courts that have addressed the issue have concluded that entry of a turnover order is appropriate if a debtor came into possession of funds of the estate after the filing of the petition, even if the debtor was no longer in possession of such funds at the time of a bankruptcy trustee's turnover motion."  *See In re Rynda*, 2011 Bankr. LEXIS 2110 at *2-3 (Bankr. N.D. Cal. 2011).  To read Section 542(a) "otherwise would enable possessors of property of the estate to escape trustees' demands simply by transferring the property to someone else."  *Beaman v. Vandeventer Black, LLP* (*In re Shearin*), 224 F.3d 353, 357 (4th Cir. 2000) (internal quotations omitted) (referencing *Boyer v. Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A.* (*In re USA Diversified Prods., Inc.*), 100 F.3d 53, 56 (7th Cir. 1996)).

**a.  The furniture, furnishings, and other personal property itemized in the Murphy Appraisal are community property, and therefore property of the estate, that must be turned over to the Trustee.**

Having concluded that Linda has no separate property, the furniture, furnishings, jewelry, Chihuly chandelier, wine collection, and other personal property itemized in the Murphy Appraisal are community property of the debtor as of the date of petition and, therefore, property of the estate.  *See* 11 U.S.C. § 541.

Linda must turn over all of the furniture, furnishings, jewelry, Chihuly chandelier, wine collection, and other personal property itemized in the Murphy Appraisal -- with one exception.

MEMORANDUM OPINION FOLLOWING TRIAL - 45

*See* 11 U.S.C. § 542.  The audio equipment that was designated in the Murphy Appraisal as built-in to the Medina house shall be excluded.  The Trustee has not demonstrated that this equipment is in the control of Linda and Mastro and/or was not sold with the Medina Residence.

The Trustee is entitled to a judgment ordering Linda to turn over the furniture, furnishings, jewelry, Chihuly chandelier, wine collection, and other personal property itemized in the Murphy Appraisal that is still in her possession or control, and if she fails to do same, the Trustee is entitled to a judgment for the value of these items.

**b.  The Gold Bars are property of the estate that must be turned over to the Trustee.**

The Gold Bars were purchased by Mastro for $99,300 shortly before bankruptcy.  The Court does not believe Linda's assertion that she was unaware of the purchase of the Gold Bars and was not involved in the transaction.  The Court concludes that the Gold Bars were community property as of the date of petition and, therefore, property of the estate.  *See* 11 U.S.C. § 541.  The Trustee is entitled to a judgment ordering Linda to turn over any of the Gold Bars that are in her possession or control and if she fails to turn over same, the Trustee is entitled to a judgment for the value of the Gold Bars to be determined at a later hearing.  *See* 11 U.S.C. § 542.

**c.  The LCY LLC Jewelry, including the Big Rings,  is property of the estate that must be turned over to the Trustee.**

Mastro and Linda transferred ownership of the following jewelry to the LCY Trust through LCY, LLC – Series Jewelry: (a) one platinum ring with 27.80 carat pear shape diamond; (b) one 14 karat white gold ring with 15.93 carat round diamond; (c) one 18 karat yellow gold diamond solitaire ring with one 14.17 carat round diamond; (d) one 18 karat yellow gold ring with one 9.68 carat diamond; (e) one 18 karat yellow gold ring with two rows of seven

MEMORANDUM OPINION FOLLOWING TRIAL - 46

diamonds, two rows of five diamonds and two rows of three diamonds; (f) two 2.5 carat earrings; and (g) one ring with one 10.25 carat diamond --- collectively, the LCY LLC Jewelry. Although Linda asserted that except for the two Big Rings (rings (a) and (b) above) the LCY LLC Jewelry did not exist and was not actually transferred into the LCY Trust, the Court does not believe her. It is illogical that Mastro would so specifically itemize jewelry that did not exist, and then purportedly transfer that jewelry into the LCY Trust -- which was itself expressly designed to protect Mastro's and Linda's assets. The Court does not believe Linda's assertion that Mastro mistakenly listed the LCY LLC Jewelry in the LCY Trust-related documents.

Having concluded that Linda has no separate property, the LCY LLC Jewelry, including the two Big Rings, was community property as of the date of petition and, therefore, property of the estate. *See* 11 U.S.C. § 541. The Trustee is entitled to a judgment ordering Linda to turn over the LCY LLC Jewelry, including the two Big Rings. *See* 11 U.S.C. § 542. If Linda fails to turn over same, the Trustee is entitled to a judgment for the value of the LCY LLC Jewelry, including the two Big Rings, to be determined at a later hearing.

**d**. **Linda is liable for her failure to turn over to the Trustee the $379,039 that was in the LCY Account on the date of the petition.**

As of January 2009, Linda's admitted signature demonstrates that she was aware of the existence of the LCY Trust. Linda was a signator on the LCY Account and wrote numerous checks thereon. As of the petition date, although undisclosed, the LCY Account was property of the estate. The Trustee is entitled to a judgment for $379,039, the amount of funds on deposit in the LCY Account on the date of the petition.

MEMORANDUM OPINION FOLLOWING TRIAL - 47

**e. Linda is liable for her failure to turn over to the Trustee the Rolls Royce or its proceeds.**

The Rolls Royce was community property. Linda transferred the Rolls Royce into the LCY Trust in October 2008. Although the exact value of the Rolls Royce on the date of transfer is difficult to determine, the Court finds that the $300,000 sale price of the Rolls Royce to the Bellevue Dealership in February 2009 is an appropriate valuation. As set forth above, the Bellevue Dealership purchased the Rolls Royce from Mastro and Linda for $300,000, and then sold it back to them. As part of the sale-back transaction, the Rolls Royce was encumbered by a lien in favor of the Bellevue Dealership. Thus, as of the date of petition, the Rolls Royce was encumbered. On July 28, 2010 Mastro and Linda sold the Rolls Royce to a third party buyer for $272,000, without obtaining requisite permission from the Court.

The Rolls Royce was property of the estate on the date of petition, but encumbered by the Bellevue Dealership's lien. Although Mastro and Linda improperly disposed of the Rolls Royce post-petition, rendering them liable pursuant to Sections 549 and 550, the proceeds of the sale of the Rolls Royce to the third party buyer were less than the amount of the encumbrance thereon. Thus, damages for purposes of turnover net to zero.[18]

**3. Linda is not liable for funds allegedly received from Hazelrigg III and Centurion Financial Group.**

Linda has no liability for funds allegedly received from Hazelrigg III in the amount of $158,000 and from Centurion Financial Group in the amount of $28,645. Although the Trustee claims these funds were advanced by Hazelrigg III to offset amounts owed to Mastro, there is no proof of any setoff actually being claimed or effectuated. Moreover, there is no proof that these

---

[18] However, Linda is liable for her disposition of the Rolls Royce and her receipt of the related proceeds. *See infra.*

MEMORANDUM OPINION FOLLOWING TRIAL - 48

transactions diminished the value of the estate.  The Gold Coins acquired by Mastro and Linda in December 2009 and January 2010, therefore, appear to be post-petition assets not subject to turnover.

**4.  Linda is liable for property fraudulently transferred into the Irrevocable Trust and for property fraudulently transferred into the LCY Trust by placing ownership of various assets in the LCY Entities.**

A bankruptcy trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –

> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or become, on or after the date that such transfer was made or such obligation was incurred, indebted; <u>or</u> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; <u>and</u> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; <u>or</u> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1) (emphasis added).  Except to the extent a transfer or obligation under  § 548 is voidable under §§ 544, 545, or 547, "a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred . . . to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation."  11 U.S.C. § 548(c).  In addition, a trustee may avoid any transfer of an interest of the debtor in property that

MEMORANDUM OPINION FOLLOWING TRIAL - 49

was made on or within 10 years before the date of the filing of the petition, if such transfer was made to a self-settled trust or similar device.  11 U.S.C. § 548(e).

Similarly, under Washington law, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor" or "(2) [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (i) [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) [i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due."  RCW 19.40.041(1)-(2) (emphases added).  In addition, Washington law provides that "all deeds of gift, all conveyances, and all transfers or assignments, verbal or written, of goods, chattels or things in action, made in trust for the use of the person making the same, shall be void as against the existing or subsequent creditors of such person."  RCW 19.36.020.

A transfer being deemed "void" under state law does not preclude the same transfer from being attacked as an avoidable fraudulent transfer under bankruptcy law.  For example, in *Wiswall v. Wallaert*, 149 B.R. 665 (Bankr. W.D. Wash. 1992), the trustee sought to recover real property he alleged that the debtors had  fraudulently transferred into a living self-settled trust. The debtors argued that "since the property remained subject to the claims of their then and future creditors [pursuant to RCW 19.36.020], nothing was conveyed."  *Id.* at 667.  The court granted partial summary judgment in favor of the trustee, unequivocally rejecting the debtors' argument that there had been no "transfer" for bankruptcy purposes.  *Id.* at 668-69.

MEMORANDUM OPINION FOLLOWING TRIAL - 50

Similarly, in *Menotte v. Champalanne (In re Champalanne)*, 425 B.R. 707, 713 (Bankr. S.D. Fla. 2010) the debtors alleged that a transfer to their family trust "was not fraudulent because under California law, the California Property remained subject to the claims of creditors after the transfer." The court held that "[e]ven if that is a correct statement of California law, the transfer may nevertheless be avoidable if the [d]ebtor acted with actual intent to hinder, delay, or defraud creditors." *Id.*; *see also In re Potter*, 2008 Bankr. LEXIS 3351 (Bankr. D. N.M. 2009) (finding a transfer invalid under California self-settled trust law, but holding the same transfer to be a fraudulent transfer pursuant to § 548(e)).

To the extent a transfer is avoided as a fraudulent transfer under 11 U.S.C. §§ 544, 548, and state law, the Trustee may recover the property transferred or the value of such property pursuant to 11 U.S.C. § 550(a)(1) from the initial transferee of such property or from the entity for whose benefit the transfer was made, or pursuant to § 550(a)(2) from any immediate or mediate transferee.

**a. The transfers of the Clyde Hill House, Highlands House, and Medina Residence into the Irrevocable Trust are (1) void as transfers made into a self-settled trust pursuant to RCW 19.36.020 and (2) avoidable by the Trustee as fraudulent transfers pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A)-(B), (e) and RCW 19.40.041(1)-(2)**

The Irrevocable Trust is a self-settled trust. Thus, the transfers of assets into the Irrevocable Trust were void as transfers made into a self-settled trust, and avoidable as fraudulent transfers. *See* RCW 19.36.020; 11 U.S.C. § 548(e). As set forth above in greater detail, Mastro transferred the unencumbered Clyde Hill House, Highlands House, and Medina Residence (collectively valued in the Irrevocable Trust documents at $23.7 million) into the Irrevocable Trust with intent to hinder, delay or defraud his creditors. No consideration was paid

MEMORANDUM OPINION FOLLOWING TRIAL - 51

for the transfers and the properties were transferred when Mastro was insolvent. Thus, the transfers of the Clyde Hill House, Highlands House, and Medina Residence into the Mastro Irrevocable Trust were fraudulent transfers.

**b. The transfers of various assets into the LCY Trust by placing ownership of the assets in the LCY LLC Entities are (1) void as transfers made into a self-settled trust pursuant to RCW 19.36.020 and (2) avoidable by the Trustee as fraudulent transfers pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A)-(B), (e) and RCW 19.40.041(1)-(2).**

The LCY Trust is a self-settled trust. Thus, the transfers of assets into the LCY Trust by placing ownership of the assets in the LCY LLC Entities are void as transfers made into a self-settled trust, and avoidable as fraudulent transfers. *See* RCW 19.36.020; 11 U.S.C. § 548(e). As set forth above in greater detail, Mastro and Linda transferred unencumbered assets, including the Medina Residence, the Rolls Royce, funds totaling approximately $1,000,000, and the LCY LLC Jewelry, including the Big Rings, into the LCY Trust by placing ownership of the assets in the LCY LLC Entities. Also as set forth above, the transfers of assets into the LCY Trust were undertaken by Mastro with intent to hinder, delay or defraud his creditors. No consideration was paid for the transfers and the properties were transferred when Mastro was insolvent. Therefore, the transfers of assets into the LCY Trust and the LCY LLC Entities were fraudulent transfers.

**c. Linda is individually liable as an "immediate or mediate" transferee pursuant to 11 U.S.C. § 550(a)(2).**

Under Section 550(a)(2), a "[t]rustee can . . . recover from any 'immediate or mediate transferee' of the initial transferee who does not take in good faith, for value, and without knowledge. *In re Bullion Reserve of North America,* 922 F.2d 544, 548 (9th Cir. 1991). Specifically, Section 550(a)(2) provides that to the extent a transfer is avoided under Section

MEMORANDUM OPINION FOLLOWING TRIAL - 52

548, a trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property from "any immediate or mediate transferee."

Although the term transferee is not defined by the Bankruptcy Code, the Ninth Circuit has adopted the "dominion test" to determine whether someone is a transferee, providing that "a transferee is one who has dominion over the money or other asset, the right to put the money to one's own purposes." *Universal Serv. Admin. Co. v. Post-Confirmation Comm.* (*In re Incomnet*), 463 F.3d 1064, 1070 (9th Cir. 2006) (internal marks omitted) (citing *Abele v. Mod. Fin. Plans Servs.* (*In re Cohen*) 300 F.3d 1097, 1102 (9th Cir. 2002)).[19] The dominion test "strongly correlates with legal title," as in the "vast majority of cases, possessing legal title to funds will equate to having dominion over them." *Incomnet*, 463 F.3d at 1073. The Ninth Circuit explained,

> The focus on "dominion" is useful for those unusual situations in which legal title to funds and the right to put those funds to use have been separated. There are two primary cases when this may occur: (1) when an entity has legal title as a formal matter, but legally does not have any discretion in the application of funds; and (2) when an entity does not possess legal title, but nevertheless has sufficient authority over the funds to direct their disbursement.

*Id.* at 1073-74. Restrictions on the use of funds over which an entity exercises control will not necessarily preclude a finding that the entity exercised "dominion" over the funds. *See Id.* at 1075.

_____

[19] In *Incomnet*, the Ninth Circuit expressly rejected the "control test," as espoused by the Eleventh Circuit, and more gently rejected other courts' attempts to blend or hybridize the separate and distinct "dominion" and "control" tests. *See generally*, 463 F.3d at 1069-1071. "The dominion test focuses on whether the recipient of funds has legal title to them and the ability to use them as he sees fit." *Incomnet*, 463 F.3d at 1071 (referencing *Bonded Fin. Servs., Inc. v. European Amer. Bank*, 838 F.2d 890, 893 (7th Cir. 1988)). "The control test takes a more gestalt view of the entire transaction to determine who, in reality, controlled the funds in question." *Incomnet*, 463 F.3d at 1071 (referencing *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1199 (11th Cir. 1988)). The Ninth Circuit stated, "we take care not to apply the more lenient 'control test.'" *Incomnet*, 463 F.3d at 1071.

Linda is a subsequent transferee for the entire net $995,106 transfer out of the LCY Account because she at all times had dominion over the LCY Account. As set forth above, Mastro and Linda fraudulently transferred net funds of approximately $1,000,000 into the LCY Account, and transferred net funds of approximately $995,106 out of the account. The Court does not believe Linda's assertions that she was not aware of and did not actively participate in concealing and spending funds from the LCY Account. To the contrary, Linda actively participated in the transfers. She was a signator on the LCY Account, and wrote numerous checks thereon. She also received the benefit of both Mastro's and her own expenditures using LCY Account funds. They used the $995,106 to pay for luxury automobiles, fine dining, designer clothing, trips to ski resorts, travel to Europe and Palm Springs, gold and lawyers. At least $70,000 of expenditures from the LCY Account are directly traceable to goods and services benefiting Linda alone. Thus, Linda is individually liable for the net $995,106 transfer out of the LCY Account.

Linda is a subsequent transferee of the proceeds of the Avatar loan in the amount of $200,000. As set forth above, Mastro and Linda received the proceeds of a $3,360,000 loan from Avatar, secured by a deed of trust on the Clyde Hill House and Highlands House which were fraudulently transferred into the Irrevocable Trust. The proceeds of the Avatar Loan included a $200,000 check payable specifically to Linda, which was later deposited into the LCY Account. Despite her assertion that the check was never delivered to or endorsed by her, she participated in receipt and disposition of the $200,000, had dominion over the funds in the LCY Account, and derived benefit from the $200,000 issued in her name. Thus, Linda is individually liable for the $200,000 received as proceeds of the Avatar Loan. Given the later deposit of the

MEMORANDUM OPINION FOLLOWING TRIAL - 54

$200,000 check into the LCY Account, the Court reiterates that it is not permitting double-recovery, but is articulating alternate bases for liability.

Finally, Linda is a subsequent transferee of the proceeds from the Rolls Royce sale and buy-back transaction. As set forth above, the Rolls Royce was fraudulently transferred into the LCY Trust. Subsequently, Linda participated in the Bellevue Dealership sale and buy-back transaction, and was the recipient of $300,000 in sale proceeds from the sale of the Rolls Royce to the Bellevue Dealership.[20] The check was made payable to Linda, and the funds were deposited into Mastro's and her joint account at Charles Schwab. Thus, Linda had dominion over the $300,000 of sale proceeds and is individually liable for the transfer of them. Alternatively, Linda is a subsequent transferee of the $272,000 of sale proceeds from the sale of the Rolls Royce to the third party buyer. The sale proceeds from the third party buyer transaction were in the form of checks made payable to the order of Linda Mastro, giving her dominion over the funds.

Although a subsequent transferee may avoid liability by taking a transfer in good faith, for value, and without knowledge, the Court finds that as to the subsequent transfers to Linda, she had knowledge of the voidability of the transfers, did not provide value for the transfers, and did not receive the transfers in good faith. *See Bullion Reserve,* 922 F.2d at 548.

---

[20] If the Rolls Royce was transferred from the LCY Trust to Linda prior to the Bellevue Dealership transaction, she would have been a subsequent transferee at that point. Either way, she was a subsequent transferee of the vehicle (valued at $300,000) or the subsequent transferee of the Bellevue Dealership transaction proceeds ($300,000).

MEMORANDUM OPINION FOLLOWING TRIAL - 55

**d.  Linda is also liable under 11 U.S.C. § 550(a)(1) as a "person for whose benefit such transfer was made" for the property fraudulently transferred into the Irrevocable Trust and for the property fraudulently transferred into the LCY Trust by placing ownership of various assets in the LCY Entities.**

Section 550(a)(1) provides that to the extent a transfer is avoided under Section 548, a trustee may recover the property or the value of the property from "the entity for whose benefit such transfer was made." *See* 11 U.S.C. § 550(a)(1).  "The phrase 'or the entity for whose benefit such transfer was made' refers to those who receive a benefit as a result of the *initial* transfer from the debtor – not as the result of a subsequent transfer." *Bullion Reserve*, 922 F.2d at 547.  "[A]n entity need not actually benefit, so long as the transfer was *made* for his benefit." *Id.* (emphasis in original). The bankruptcy trustee's power to recover from the entity "for whose benefit such transfer was made" is absolute.  *Id.*

Ninth Circuit case law suggests that the beneficiary of a trust may be considered a person for whose benefit a transfer into a trust is made, and may be held strictly liable under § 550(a)(1). *See Kosmala v. Imhof (In re Hessco)*, 295 B.R. 372, 377-78 (BAP 9th Cir. 2003) (finding that "[a]lthough . . . not the sole beneficiaries, the bankruptcy court did not err in finding the deposits to the Trust's account were made for their benefit"); *Kupetz v. United States (In re California Trade Technical Schools, Inc.)*, 923 F.2d 641 (9th Cir. 1991) (finding that the Department of Education's status as beneficiary of a trust is what rendered it the entity for whose benefit the transfer was made); *see also Brown v. Philips*, 379 B.R. 765 (Bankr. N.D. Ill. 2007) (holding the beneficiary of a trust liable pursuant to § 550(a)(1)); *Terry v. Paxchall*, 403 B.R. 366 (Bankr. E.D. Va. 2009) (same).

MEMORANDUM OPINION FOLLOWING TRIAL - 56

Linda and Mastro were both individually beneficiaries of the Irrevocable Trust and the LCY Trust. In addition, the structure of the transactions and the supporting facts and circumstances all indicate that each of the transfers into the Irrevocable Trust and into the LCY Trust was made to benefit Linda. For this reason, the Court concludes that Linda is individually and separately liable under 11 U.S.C. § 550(a)(1) for each of the transfers set forth above for which she has been found liable pursuant to 11 U.S.C. § 550(a)(2).[21] *See Hessco,* 295 B.R. at 377-78; *California Trade Technical Schools*, 923 F.2d 641. Again, although the Court is articulating parallel legal bases for liability, the Trustee is entitled to only one recovery. The Court would have held Linda liable for all transfers into the Irrevocable Trust[22] and for all transfers into the LCY Trust,[23] but is limiting the Trustee's recovery to what the Trustee requested as set forth in the Pretrial Order.

---

[21] The Court acknowledges the language in *Bullion Reserve* explaining that a "subsequent transferee cannot be an entity for whose benefit the initial transfer was made." 922 F.2d at 547. However, the Court does not believe that language was intended to be a limitation on finding alternative bases for liability. Instead, the Court finds the language appropriate, in context, to illustrate how the "structure of [Section 550(a)] separates initial transferees and beneficiaries . . . from immediate or mediate transferees." *Id.* In other words, a subsequent transferee under section 550(a)(2) who is benefited by the transfer does not immediately become a person "for whose benefit" a transfer was made under 550(a)(1) merely because he benefited.

[22] The Court would have calculated Linda's liability at $14,591,010.36. This figure is based upon the $23,700,000 valuation of the Medina, Clyde Hill, and Highland houses in the Irrevocable Trust documents, minus $750,000 received from the Avatar settlement, minus $8,358,990 received in net proceeds from the sale of the Medina house.

[23] The Court would have found Linda liable as a person "for whose benefit" the following voidable transfers were made: (1) transfer of the Medina Residence, valued at approximately $18,000,000, into LCY LLC – Series Home, (2) net transfer of funds totaling approximately $1 million into the LCY LLC bank account, (3) transfer of the LCY LLC Jewelry, including the two Big Rings, into LCY LLC - Series Jewelry, and (4) transfer of the Rolls Royce, valued at approximately $300,000, into LCY LLC – Series Auto.

MEMORANDUM OPINION FOLLOWING TRIAL - 57

**Michael K**

Section 550(a)(1) provides that to the extent a transfer is avoided under Section 548, a trustee may recover property or the value of the property from the initial transferee of such transfer. *See* 11 U.S.C. § 5501(a)(1). "Section 550(a) does not define the phrase 'initial transferee.'" *Incomnet*, 463 F.3d at 1069. However, as set forth above, the Ninth Circuit has adopted the "dominion test" to determine whether someone is a transferee, providing that "a transferee is one who has dominion over the money or other asset, the right to put the money to one's own purposes." *Id.* at 1070 (internal marks omitted).

The dominion test "strongly correlates with legal title," as in the "vast majority of cases, possessing legal title to funds will equate to having dominion over them." *Id.* at 1073. Under Washington law, "legal and equitable ownership of . . . trust property is divided between two parties; the trustee has bare legal title and the beneficiary has the equitable or beneficial ownership." *O'Steen v. Estate of Wineberg*, 30 Wn. App. 923, 932 (Wash. Ct. App. 1982); *see also In re Marriage of McKean*, 110 Wn. App. 191, 195 (Wash. Ct. App. 2002).

Given (1) the dominion test's strong emphasis on legal title, (2) Washington law indicating that a trustee holds legal title to trust property, (3) the Ninth Circuit's express rejection of the less stringent "control test" espoused in other circuits,[24] and (4) *Incomnet*'s directive that "dominion" can exist even where an entity has limitations placed on its ability to direct the funds, this Court concludes that, generally, the trustee of a trust has dominion over trust property by holding legal title to the trust's corpus. Although a trustee's discretion may be bound by the confines of the operative trust documents *vis a vis* the beneficiary, that does not preclude a trustee from having dominion over the transferred assets. *See Incomnet*, 463 F.3d at 1075.

---

[24] *See supra*, at note 19.

MEMORANDUM OPINION FOLLOWING TRIAL - 58

The Ninth Circuit has not yet decided in what capacity the trustee of a trust may be liable as an initial transferee under § 550(a)(1). The Trustee relies on *In re Newman Companies, Inc.*, 140 B.R. 495 (Bankr. E.D. Wis. 1992) and *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688 (7th Cir. 2010), as authority for holding a trustee personally liable as an "initial transferee" under Section 550. Although *Newman* held a trustee personally liable as an "initial transferee," the Court finds the case to be limited to its own facts, and not persuasive. *Newman*, 140 B.R. at 499.

In *Paloian*, the Seventh Circuit held LaSalle Bank, as trustee for a pool of investors, liable as an "initial transferee" under Section 550. However, LaSalle Bank was "a litigant *only* in a trustee's capacity." *Paloian*, 619 F.3d at 690 (emphasis added). The Court reasoned,

> Although LaSalle Bank has duties to the trust's beneficiaries (the investors) concerning the application of funds, the assets' owner remains the appropriate subject of a preference-avoidance action. If LaSalle Bank must hand $10 million over to the bankruptcy estate, *it will draw that money from the corpus of the trust, not from the Bank's corporate assets.* This means that the money really comes from the trust's investors – the persons for whose benefit the transfer was made . . . [A] preferential transfer to a trust is appropriately recovered from the trustee, *who will charge it to the trust* and thus create the appropriate economic incidence.

*Id.* at 691-92 (emphasis added).

The Restatement (Second) of Trusts provides that "[w]here liability to third persons is imposed upon [a trustee] . . . because he is the holder of the title to property, a trustee as holder of the title to the trust property is subject to personal liability, but only to the extent to which the trust estate is sufficient to indemnify him." *Restatement* (*Second*) *of Trusts* § 265 (1959). However, Comment A to the Restatement clarifies that "[t]he modern trend has been to hold the trustee as holder of the title to the trust property liable to third persons only as trustee, that is only

MEMORANDUM OPINION FOLLOWING TRIAL - 59

to the extent to which the trust estate is sufficient to indemnify him."[25]  *Id.* at cmt. a.   Recently the Ninth Circuit ruled that a trustee was correct in asserting that "the general law of trusts shield[ed] its personal assets from liabilities incurred while acting as a representative for the trust." *See Biltmore Assoc., LLC v. Twin City Fire Ins. Co.*, 572 F.3d 663, 676 (9th Cir. 2009).

This Court finds the logic of *Paloian* compelling, and concludes that, generally, a trustee should not be personally liable as an "initial transferee" under Section 550(a)(1).  Rather, a trustee should be liable only in its capacity as trustee, and should draw from the corpus of the trust to satisfy its liability.  Were the law applied otherwise, it would be an unduly broad and inequitable expansion of transferee liability.

**1.  Michael K is liable as an "initial transferee" for the net value of the Clyde Hill House, Highlands House, and Medina Residence transferred into the Irrevocable Trust, but solely in his capacity as co-trustee of the Irrevocable Trust, pursuant to 11 U.S.C. § 550(a)(1), and § 544 and RCW 19.40.041(1).**

As co-trustee, Michael K held legal title to the Irrevocable Trust property – the Clyde Hill House, Highlands House, and Medina Residence.  He admitted to being Co-Trustee of the Irrevocable Trust on multiple occasions leading up to trial.[26]  Although at trial Michael K questioned the authenticity of his signature on various documents, including the Irrevocable

---

[25] Holding a trustee liable only in his capacity as trustee differs from "the earlier law in which the "Holder of the title to the trust property was subject to personal liability to third persons to the same extent that he would have been liable if he had held the property free of trust." *Restatement* (*Second*) *of Trusts* § 265 (1959), cmt. a.

[26] For example, in an October 2010 declaration Michael K stated,  "I was co-trustee of the Trust along with my father."  In a March 2010 deposition, the Trustee asked, "Does your signature appear on the signature page of this [Mastro Irrevocable Trust] document?  Michael K responded, "Yes."   The Trustee probed, "That's your actual signature?"  Michael K responded, "Yes. I sign different all the time."  The Trustee inquired, "Why do you do that?"  Michael K responded, "It depends on what mood I'm in, I guess."  Finally, in the Pretrial Order, Michael K admitted that on August 1, 2008 he, along with his father as Co-Trustee, entered into the Mastro Irrevocable Trust Agreement.

MEMORANDUM OPINION FOLLOWING TRIAL - 60

Trust Agreement, Michael K is bound by his judicial admissions and cannot now claim that he was not the co-trustee of the Irrevocable Trust. As explained by the Ninth Circuit,

> Under federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court. Not only are such admissions and stipulations binding before the trial court, but they are binding on appeal as well. . . . Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact . . . Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them.

*American Title Insurance Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988).

Further, despite Michael K's claims that he did not sign various operative documents and his submission of signature comparisons to allegedly illustrate same, this Court finds it more likely than not that Michael K signed the documents. The Court is admittedly not a handwriting expert. However, Michael K submitted no conclusive evidence or expert testimony establishing that he did not sign the documents as he originally testified.

Review of the Irrevocable Trust Agreement indicates that Michael K, as co-trustee, shared authority with Mastro to administer and manage the Irrevocable Trust's affairs. By jointly holding legal title and jointly managing the Irrevocable Trust's affairs, Michael K exercised dominion sufficient to render him liable as an "initial transferee" under Section 550(a)(1). Although this Court believes that as a practical matter Michael K operated entirely at his father's direction and whim, and did not receive any personal benefit from participating in the Irrevocable Trust's transactions, that does not change the legal conclusion that Michael K exercised dominion.

Therefore, Michael K is liable for $23,700,000 as an initial transferee of the property fraudulently transferred to the Irrevocable Trust, less the net amount of $750,000 recovered by

the Trustee from the sale of the Clyde Hill House, and less the net amount of $8,358,990 recovered by the Trustee from the sale of the Medina Residence. However, as set forth above, this Court finds the logic of *Paloian* compelling, and holds that although Michael K is liable as an initial transferee, he is liable *only* in his capacity as trustee. He is not personally liable.

The equities of the situation support the Court's conclusion. Michael K's motivation for participating as co-trustee of the Irrevocable Trust appears to have derived solely from his personal relationship with his father. His participation was not undertaken to benefit, and in no way benefited, his marital community or himself personally.

### LCY Trust, Compass Trust Corp. and Compass S.A.

Compass Trust Corp. and Compass S.A. appeared in this matter through counsel and filed answers to the Trustee's complaint, but failed to cooperate in discovery. The Court entered the Discovery Order compelling the entities to cooperate, and later issued the Sanctions Order finding the entities in contempt, and awarding discovery sanctions of $1,000 per day commencing May 25, 2010. Compass Trust Corp. and Compass S.A. did not participate at trial, and are in default.

Compass Trust Corp. and Compass S.A. are jointly and severally liable for discovery sanctions pursuant to the Sanctions Order. As of July 1, 2011, the accrued discovery sanctions totaled $402,000, and continue at $1,000 per day through the date of judgment.

Compass Trust Corp. is liable pursuant to 11 U.S.C. § 550(a)(1) as an "initial transferee" of property fraudulently transferred to the LCY Trust -- but only in its capacity as trustee of the LCY Trust. Compass Trust Corp. has no personal liability for the transfers.[27]

---

[27] The Trustee proposed a conclusion of law avoiding the purported transfers of LCY Trust assets by Compass Trust Corp. and Compass S.A. to Mastro and Linda on March 19, 2010, resulting, apparently, from the March 2010 purported dissolution of the LCY Trust. This was not addressed in the Pretrial Order, and it does not appear to the Court that any result of the

MEMORANDUM OPINION FOLLOWING TRIAL - 62

## **Hendrik Dorssers and Concept Dorssers**

Dorssers is owed nothing pursuant to the February Note, and the Medina Deed of Trust is not valid or enforceable for a plethora of reasons.

First, the February Note transaction was not consummated. Dorssers may have initially believed that he was getting a valid deed of trust as part of the February Note transaction. However, because that the February Note was for the amount of $12,000,000 – far beyond Dorssers' lending capacity – it is unlikely that Dorssers actually believed the February Note transaction was legitimate. On their face, the documents memorializing the February Note transaction are blatantly inconsistent with the transaction that Dorssers asserts occurred and do not evidence a transaction by which Mastro intended to be bound.

The February Note provided that the maker promised to pay the sum of $12,000,000, "*or so much thereof as may be disbursed,* to or for the benefit of the Maker in accordance with *this Note.*" (emphasis added). Although the terms of the February Note indicated that it encompassed up to $12,000,000 of funds to be loaned in the future, it is undisputed that neither Dorssers (nor any other party) advanced new funds in connection with the February Note. Although Dorssers had advanced approximately $1,200,000 to Mastro pursuant to the November Note, the February Note transaction was wholly separate. The February Note made no reference to the November Note, to supplanting or amending any earlier notes, or to any previous loans *at all.* In fact, the November 2008 Promissory Note was not canceled and remains unpaid. Likewise, the Medina Deed of Trust also did not reference the November Note transaction or any prior loans. It purported to secure only the February Note of "even date."

dissolution of the LCY Trust, or transfers made in connection therewith, had the effect of removing assets from the bankruptcy estate. Therefore, the Court makes no determination of § 549 liability based on the March 2010 LCY Trust dissolution.

MEMORANDUM OPINION FOLLOWING TRIAL - 63

A further inconsistency suggesting that the November Note and February Note were not intended to be related is that the notes were made between different parties. The November Note was between Mastro and Mastandrea as makers, and Hendrik Dorssers as Lender. The February Note was between Mastro, Linda, and LCY LLC-Series Home as makers and Concept Dorssers as lender. It would make little sense for Dorssers to sign a note with LCY LLC Series –Home, an entity to whom he has never loaned money.

The Escrow Instructions for the February Note Transaction were also objectively inconsistent with the purported transaction. Although the Escrow Instructions noted that $1,200,000 had been advanced outside of escrow, they also provided that another $10,800,000 was to be advanced outside of escrow. Dorssers has never claimed that he intended, or would have been able, to advance funds in any amount even close to $10,800,000.

The Memorandum of Understanding that Dorssers signed, in which he allegedly agreed to enforce the February Note and Medina Deed of Trust on behalf of other parties also purportedly secured by the Medina Deed of Trust, is a blatant after-the-fact attempt to try to make the February Note transaction appear legitimate. Dorssers admitted the document was back-dated to December 11, 2008, and that the first time he ever saw the Memorandum of Understanding was when it was faxed to him in the middle of the night on September 11, 2009.

All of these factors indicate that the February Note transaction was not grounded in reality.

Second, Mastro, Linda, and LCY LLC- Series Home had no intention of encumbering the Medina Residence. It would be illogical for Mastro and Linda to go to the trouble of transferring the Medina Residence into the LCY Trust, itself designed to protect assets, only to turn around and gratuitously encumber the property. It is undisputed that no new money was advanced in

MEMORANDUM OPINION FOLLOWING TRIAL - 64

connection with the February Note transaction. Moreover, Mastro was a sophisticated real estate developer, with sophisticated legal counsel. Had Mastro's and Linda's intent been to encumber the Medina Residence to secure loans previously made by various Friends and Family, they were familiar with the procedures necessary to accomplish same. As set forth above, the entire transaction surrounding the February Note and Medina Deed of Trust reeks of an attempt to hinder, delay, or defraud Mastro's creditors by attempting to give the appearance that the Medina Residence was encumbered although it really was not.

Dorssers asserted that his receipt of five payments of $3,000 per month, consistent with the Loan Fee Agreement, indicated Mastro's and Linda's intent to be bound by the February Note and Medina Deed of Trust. This Court finds that the payments of $3,000 per month are a neutral fact. Although the payment amounts are consistent with the Loan Fee Agreement, the February Note transaction was a sham. The payments would be equally consistent with Mastro's fraudulent intent for Dorssers to *believe* he had a valid note and deed of trust.

Third, the February Note was not delivered as required by applicable law. Dorssers is neither a holder nor a holder in due course. Although Dorssers was generally a truthful witness, the Court does not believe Dorssers' self-serving testimony that while staying at a property owned by or rented to Hazelrigg III, he briefly held a stack of papers containing the original February Note and Medina Deed of Trust, thereby effectuating delivery.

Dorssers asserted, alternatively, that his receipt of interest-only payments supported "constructive delivery" of the February Note. However, the interest-only payments related to the November Note transaction, not the February Note transaction. The November Note indicated that payments to Dorssers were to begin on December 5, 2008. Consistent with the November Note, from December 2008 to July or August of 2009, Dorssers received at least seven interest-

only payments in the amount of $9,876.13 each. This payment amount ($9,876.13) would reflect 10% annum interest-only payments on a $1,185,136 balance.

The Medina Deed of Trust is avoidable by the Trustee as a fraudulent transfer pursuant to § 548 as the entire February Note transaction was sham. To the extent Dorssers would seek to invoke the good faith defense provided in § 548(c), his efforts fail. The burden of proof is on Dorssers to establish good faith. *See e.g., In re Agric. Research and Tech. Group, Inc.,* 916 F.2d 528, 535 (9th Cir. 1990). Good faith is based on an objective standard. *Id.* at 535-36. As one court explained,

> If a transferee possesses knowledge of the facts that suggests a transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge. In such a situation, the transferee is held to have knowledge of the voidability of the transfer.

*Brown v. Third Nat'l Bank* (*In re Sherman*), 67 F.3d 1348, 1357 (8th Cir. 1995) (citations omitted).

Dorssers has not met his burden of establishing a good faith defense. At best, he appears to have been too trusting of Mastro and Hazelrigg III. At worst, Dorssers was fully aware the transaction was a sham, but played along to further his own interests. Either way, the Court concludes that Dorssers was on notice that the circumstances surrounding the February Note and Medina Deed of Trust transaction were amiss and that he should have further inquired. In sum: the February Note and Medina Deed of Trust were facially inconsistent with Dorssers' purported understanding of the transaction; Dorssers did not provide anything new of value in exchange for the February Note and Medina Deed of Trust; Dorssers had never loaned money to LCY LLC – Series Home; the February Note and Medina Deed of Trust were approximately ten times greater than the amount Hendrik Dorssers claimed he was owed pursuant to the November Note

MEMORANDUM OPINION FOLLOWING TRIAL - 66

transcription; Dorssers did not receive delivery of the February Note;  Dorssers signed escrow

instructions that were facially inaccurate; and Dorssers received and signed a midnight-faxed

Memorandum of Understanding that was backdated.

The February Note and Medina Deed of Trust are not enforceable and do not create any

valid lien against the Medina Residence or any other property of the bankruptcy estate.  The

Medina Deed of Trust was a sham, recorded while Mastro was insolvent, with an intent to

hinder, delay, or defraud his creditors by giving the appearance that the Medina Residence was

encumbered while it really was not.  Nothing is owing on the February Note because no

advances were made after its execution and because the February Note transaction was a sham.

The execution of the February Note and Medina Deed of Trust are avoidable by the Trustee as

fraudulent transfers pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A)-(B), (e) and RCW 19.40.041(1)-

(2).  Dorssers, therefore, is entitled to no judgment against Linda.

### **<u>Prejudgment Interest</u>**

The Trustee is entitled to prejudgment interest at the federal prejudgment interest rate on

all liquidated amounts awarded above.  *See e.g.*, *Banks v. Gill Distrib. Ctrs., Inc.* (*In re Banks*),

263 F.3d 862, 871 (9th Cir. 2001).

### **CONCLUSION**

The Trustee shall present separate judgments consistent with the findings and conclusions

set forth in this Memorandum Opinion.  Where the Court has articulated alternative bases for

liability, the form of judgment should provide clarity to avoid the possibility of eventual double

recovery.

**Marc Barreca**
**United States Bankruptcy Judge**
**(Dated as of Entered on Docket date above)**

MEMORANDUM OPINION FOLLOWING TRIAL - 67